**OHIO FERRO-ALLOYS CORP.**

v.

**NATIONAL LABOR RELATIONS BOARD.**

No. 11943.

United States Court of Appeals
Sixth Circuit.

June 17, 1954.

Robert N. Rybolt, Canton, Ohio, John G. Ketterer, Day, Cope, Ketterer, Raley & Wright, Canton, Ohio, on the brief, for petitioner.

Fannie M. Boyls, Washington, D. C., George J. Bott, David P. Findling, A. Norman Somers, Thomas R. Haley, Washington, D. C., on the brief, for respondent.

Before MARTIN, McALLISTER and MILLER, Circuit Judges.

MARTIN, Circuit Judge.

Ohio Ferro-Alloys Corporation has petitioned this court to review a decision and order of the National Labor Relations Board issued on April 30, 1953; and, in its answer to the petition, the Labor Board has prayed this court for the entry of an order of enforcement of its decision.

The Labor Board adopted the Intermediate Report of the Trial Examiner with some additions and modifications; found the corporation to have committed unfair labor practices; and ordered it to cease and desist from discharging or refusing to reinstate employees because of their participation in a strike in November of 1951, and from discouraging membership in a union of the employees' own choice by discriminating in respect to the hiring or tenure of employment of its employees or in any other manner interfering with, restraining or coercing its employees in their rights under the National Labor Relations Act, 29 U.S.C.A. § 151 et seq. The board further ordered

the petitioning company to offer reinstatement, with back pay to numerous listed former employees.

The crucial issues are whether the strike was unlawful, and whether the respondent company (petitioner here) committed an unfair labor practice in refusing reinstatement of the strikers.

Petitioner, Ohio Ferro-Alloys Corporation, operates three plants. The one involved here is the plant located at Brilliant, Ohio. Construction of this plant was begun in 1951. Operations actually commenced on October 3, 1951, at which time the number of employees was 55. A second furnace was put into operation on November 13, 1951, and more employees were hired to bring the total number up to 93 as of November 16, 1951.

On November 14, 1951, R. D. Crawford, the plant supervisor, received a letter from United Mine Workers, District 50, dated November 13, 1951, and bearing the signature of Joseph DiStefano. The letter demanded recognition of District 50 as the collective bargaining representative of the company's employees at the Brilliant plant and was forwarded to John P. Harris, personnel director of the company in Canton, Ohio, where it was received on November 15. On the same date, a representative of the United Steelworkers of America, CIO, called Harris by telephone and stated that the steelworkers had signed a majority of the employees. He requested recognition of that union as bargaining agent.

By letter of November 17, 1951, the company advised District 50 that a conflicting claim existed and that, therefore, the company would not deal with any union until it had been certified following an election by secret ballot to be conducted by the National Labor Relations Board.

On November 16, DiStefano came to the Brilliant plant to see Crawford, the company's superintendent. He and its president, Cunningham, were giving attention at the time to some difficulties in connection with the new furnace; and word was sent back that Crawford would see the labor representative the following day.

Without any further communication or attempt to communicate, the UMW union called a strike and picketing began at six o'clock A.M., on November 17. In DiStefano's words, the purpose of the strike was to "force the Company * * * to recognize us." Crawford and Cunningham talked with DiStefano and informed him that they would not recognize any union until it had been selected by secret vote of a majority of the employees.

The next communication between District 50, UMW, and the company was on November 20. Prior to this time, an employee who had continued to work was assaulted by two strikers, Neagos and Minozzi. In a trial before the Mayor of Brilliant, Ohio, they were found guilty of assault and battery. Other acts of violence were committed on the picket line; and the company filed, in the Court of Common Pleas of Jefferson County, Ohio, a petition for an injunction to restrict the picketing activities and to restrain any violence in connection with the strike. A conference was held at the suggestion of the trial judge in an attempt to work out a temporary restraining order. At this conference, DiStefano suggested that the strike end, provided the company would agree to take back all the men, including Neagos and Minozzi. The company refused to do so; and, on the next day, Harris again met with DiStefano without reaching an agreement. During the entire period of the strike and the negotiations to end it, the company had been hiring new employees to fill the jobs of the strikers and to fill new jobs.

On Sunday, November 25, District 50 representatives Sabatino and Strauss came to the plant. Twenty of the strikers also came; and company officials were informed that the men wanted to return to work. Later in the day, Sabatino and Strauss were informed that the company was not sure as to the need of

further personnel, but that if the strikers wanted to come back to work they would have to file new written applications which would be considered along with all the other applications. In response to a question by Sabatino, it was made clear by the company officials that the strikers were to be treated as new employees. The picket signs were removed on November 26. Following the strike, a total of eleven strikers actually filed written applications. Of these, four were rehired, the dates of rehiring varying from November 29, 1951, to January 3, 1952.

On behalf of the steelworkers union, the CIO filed a petition for certification as collective bargaining representative of petitioner's employees on November 19, 1951; and, on January 16, 1952—after several delays—a formal hearing was held before the National Labor Relations Board on the certification petition. An election was held on April 3 and 4, 1952. Of the listed 177 eligible voters, including the participants in the strike and their replacements, all of whom were permitted to vote subject to challenge, there were 74 voters in favor of the CIO and none against it. The remaining 65 votes cast were challenged and, since they could not affect the outcome of the election, were not counted. On April 11, 1952, the National Labor Relations Board certified the CIO as the representative of the employees.

On December 19, 1951, an unfair labor practice charge was filed by William J. Baricska and later, on December 20 and 21, thirty-five additional charges were filed by various individuals. DiStefano testified that the charges were made out in a meeting hall of the UMW in Yorkville. Lewis Palmer, who filed charges on his own behalf and on behalf of an annexed list of individuals, testified that the charges were made out in his home and that there were present at that time Tyner, a Labor Board representative, and several of the strikers, including Savage and others. Savage and Baricska were identified as officers of the local District 50, UMW.

In his Intermediate Report, the Trial Examiner thus states clearly the petitioner's argument: "UMW was striking to force the Respondent [company] to recognize it as the exclusive bargaining agent of its employees in the face of a conflicting claim for such recognition made by the Steelworkers; that it would have been an unfair labor practice before the Respondent to have recognized UMW under such circumstances so that the strike was in fact, to force the Respondent to commit an illegal act; and so, the object of the strike being illegal, the strike itself was illegal and the employees participating therein were engaging in an illegal act and thus placed themselves beyond the protection of the Act and subject to discharge at the discretion of the Respondent."

At the outset, the dilemma of the company is apparent. The UMW representative claimed that his union represented the employees and, almost immediately thereafter, the company was notified that the United Steelworkers of America, CIO, represented the same unit of employees. UMW called a strike, without offering proof of its majority representation and without giving the company an adequate opportunity to talk with UMW officials or to request proof of majority representation by the union. The Trial Examiner found that this was a strike for recognition; but the Labor Board modified this finding by a finding that, from November 20 to November 24, when the strikers offered to return unconditionally, the union continued to strike, not for the purpose of winning recognition, but rather to obtain reinstatement for the two employees (Neagos and Minozzi) whom the company deemed objectionable. The two men had been fined for assault and battery on a non-striker. Both the Trial Examiner and the National Labor Relations Board found that the strike was at all times lawful.

The company had a history of good labor relations and, up to the time of this strike, had never been charged with unfair labor acts. The first notice of any claim of employee representation

was received by the company on November 14, 1951. The letter of notification stated that the UMW had been selected by an "overwhelming majority" of employees for purposes of representation, and requested a meeting with representatives of the company. No particular time was specified for the meeting. Next day, the company received a telephone call from a representative of the steelworkers union who claimed that his union represented the employees. He requested the company to bargain with them. On the next afternoon, November 16, 1951, the UMW representative, DiStefano, called at the plant and was informed that the officials could not see him, because they were busy in the plant at the time, but that they would talk with him the following day if he would return. Without any further attempt to meet with the company officials, the United Mine Workers instigated a strike beginning at six o'clock on the next morning.

The company contends that, since two unions had each claimed to represent the employees, it could not recognize either until the Labor Board had held an election by secret ballot and had certified one of the unions as bargaining agent. See Midwest Piping and Supply Co., 63 N.L. R.B. 1060.

It is apparent that this position taken by the company would be unfavorable to the UMW, inasmuch as that union had not complied with section 9(h) of the Act by filing the required non-communist affidavits. In the words of the Trial Examiner: "By reason of the UMW's failure to comply with Section 9(h) of the Act, the Act prohibited the Board from investigating or processing any matter concerning representation or any charge of unfair labor practices made by UMW. Thus, by the terms of the Act itself, UMW was restricted by law to self-help, i. e., the strike, in all matters pertaining to representation or to unfair labor practices. *Thus, there was no peaceful administrative process to which UMW could turn* to secure the representation it requested from the Respondent. * * *" [Emphasis added.]

It should be observed that the underlined portion of the above quotation indicates that the Trial Examiner realized that the refusal of the UMW to comply with Section 9(h) of the Act left it without any means to solve the problem peaceably. As quoted by the company in its brief, upon highest authority, it is one of the purposes of the Act to "promote peaceful settlements of disputes by providing legal remedies for the invasion of the employees' rights." N. L. R. B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 257, 258, 59 S.Ct. 490, 497, 83 L.Ed. 627.

The Tennessee Egg Company case is clearly distinguishable from the case at bar, in that there the union did comply with the Act by having the required anti-communist affidavits filed after the charges had been made; while here, no such affidavits were ever filed. N. L. R. B. v. Tennessee Egg Company, 6 Cir., 199 F.2d 95; Id., 6 Cir., 201 F.2d 370.

The United States Court of Appeals for the Third Circuit has held, in N. L. R. B. v. Epstein, 1953, 203 F.2d 482, 484, that "an employer may rightly withhold recognition from a union possessed of majority status and request an election to confirm its accreditation if there is a bona fide doubt of a majority." The court goes on to say that the above stated rule is not in effect, if the employer is refusing merely to gain time to undermine the union. There is no evidence that such was the situation here. The petitioning company refused to recognize either union because no proof had been offered as to which one actually represented the majority. See also N. L. R. B. v. Jackson Press, 7 Cir., 1953, 201 F.2d 541, 544 where it was said: "When an employer is faced with a demand for recognition by a union, it may in good faith withhold recognition until the union's representation claims are established by a Board conducted election." The Court of Appeals cites several cases as authority for its statement including North Electric Mfg. Co. v. N. L. R. B., 6 Cir., 123 F.2d 887, 889 and Joy Silk Mills v.

N. L. R. B., 87 U.S.App.D.C. 360, 185 F.2d 732.

In North Electric Mfg. Co. v. N. L. R. B., supra, Judge Allen said [123 F.2d 889]: "It is not a violation of the Act for the management to desire reasonable proof of majority unionization and an authentic selection of a bargaining agent. On the contrary, the refusal of an employer to recognize the union as representative of the employees without an election is not an unfair labor practice. (Citing cases.)" Thus, it is clear from the authorities that the company here had not only the right to refuse recognition of the UMW in the face of another union's claim to representation, but also a duty not to recognize it.

The Labor Board modified the Trial Examiner's finding by holding that, after November 20, the strike was not for recognition, but to· force the company to take back two workers, Neagos and Minozzi. The Trial Examiner found, and we agree with his finding, that the purpose of the strike did not change when the UMW found that the steelworkers had filed a petition for certification by the Board. Officials of the company and of the UMW met to discuss a state injunction which the company had obtained against the United Mine Workers Union. It was at this meeting that the UMW learned of the filing of the petition by the steelworkers for certification. The UMW then offered to return all the strikers to work, if the company would assist in securing a quick election by the Labor Board and if, in the event of the loss of the election by the steelworkers' union, a privately conducted election would be arranged whereby UMW could prove its majority and secure recognition. The Trial Examiner said concerning this that the "undersigned . . . can only hold that perhaps the reinstatement of the two employees involved was added to the preexisting demand for recognition at this time but cannot hold that the demand for recognition was abandoned at that time." This holding seems to be a much more logical deduction from the facts than that drawn by the Labor Board. We accept the conclusion of the Trial Examiner.

Inasmuch as the UMW was still demanding recognition after notice of the filing of a petition for certification, the strike was still illegal under the doctrine of Hoover v. N. L. R. B., 6 Cir., 1951, 191 F.2d 380, 385, 386, in which Judge McAllister thus spoke for this court: "Under the Act, when a petition is filed by an employee or a group of employees alleging that a substantial number of employees wishes to be represented for collective bargaining, the Board is directed to investigate such petition, and if it has reasonable cause to believe that a question of representation affecting commerce exists, it is further directed to provide for an appropriate hearing upon due notice; and if it finds that such a question of representation exists, it is required to direct an election by secret ballot and to certify the results thereof. 29 U.S.C.A. § 159(c) (1) (A) and (B). A boycott instituted by a union, as in this case, during the pendency of proceedings for an election ordered by the Board, to force the employer to recognize it as the bargaining agent of the employees in preference to a competing labor organization, was a direct interference with the Board's election procedures and with the right of the employees to select bargaining representatives of their own choosing. If, during the pendency of these proceedings for an election to determine the bargaining agent, The Hoover Company had recognized the United Electrical Workers as bargaining agent, it would have been guilty of an interference with the Board's election procedures, as well as an unfair labor practice, in violation of Section 8(a) (1) of the Act, for interfering with and restraining its employees in the exercise of their right of self-organization and the right to bargain through a representative of their own choosing. For an employer is obliged to remain neutral and can not recognize or bargain with one of the two or more unions competing for such recognition during the

pendency of a representation proceeding. If the company, therefore, had recognized the United Electrical Workers union during the pendency of the representation proceedings, it would have been guilty of an illegal act; and a boycott to compel it to commit an unlawful act would obviously be for an unlawful purpose. The Act does not confer absolute right upon employees to engage in every kind of strike or other concerted activity; and the fact that certain concerted activity is explicitly protected by the statute, does not mean that improper concerted activity is also protected. For it is not necessary that such improper activities be explicitly excepted from the protection of the statute. The rights set forth in the Act are not to be considered as including the right to commit or participate in unfair labor practices or unlawful concerted activities; and the courts have firmly established the rule that under the provisions of Section 7 of the Act, employees are not given any right to engage in unlawful or other improper conduct. International Union, Auto Workers, v. Wisconsin Employment Relations Board, 336 U.S. 245, 69 S.Ct. 516, 93 L.Ed. 651. In this case, since the United Electrical Workers union was guilty of instigating a boycott for an unlawful purpose, such concerted activity was not protected by the Act. The Hoover Company, therefore, had the right to discharge or refuse to reinstate those employees who were engaging in and maintaining a boycott to force it to recognize the United Electrical Workers union while representation proceedings were pending on the petition of a competing union to select a bargaining representative."

The strike having been found illegal, the company was within its rights in discharging the strikers; and they were not entitled to reinstatement. N. L. R. B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627; N. L. R. B. v. Sands Mfg. Co., 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682.

The Trial Examiner found that the company has engaged in unfair labor practices by discriminating in the hire and tenure of employment of those employees listed in Appendix A and by refusing and failing to reinstate forty of them on November 24, 1951, thereby discouraging membership in a union of their own choosing and interfering with, restraining, and coercing employees in the exercise of the rights guaranteed in section 7 of the Act. This finding is erroneous in view of the fact that the strike was unlawful, in which event the strikers were not entitled to reinstatement.

In view of our aforestated conclusion on the main issue, we consider it unnecessary to discuss the other issues raised in the case.

It is ordered that the decision and order of the National Labor Relations Board be vacated and annulled, and the complaint issued by the Board against the petitioner, Ohio Ferro-Alloys Corporation, be dismissed.