**TUNGSTEN MINING CORPORA-
TION, Appellant,**

v.

**DISTRICT 50, UNITED MINE WORK-
ERS OF AMERICA, Appellee.**

No. 7293.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 20, 1956.

Decided Feb. 12, 1957.

Rehearing Denied March 25, 1957.

Whiteford S. Blakeney, Charlotte, N. C. (F. L. Fuller, Jr., Durham, N. C., and A. W. Gholson, Jr., Henderson, N. C., on brief), for appellant.

Banks Arendell, Raleigh, N. C., Yelverton Cowherd, Washington, D. C., and Charles P. Green, Louisville, N. C. (Alfred D. Treherne, Washington, D. C., and Armistead J. Maupin, Raleigh, N. C., on brief), for appellee.

Before PARKER, Chief Judge, SOBELOFF, Circuit Judge, and R. DORSEY WATKINS, District Judge.

R. DORSEY WATKINS, District Judge.

Plaintiff-appellant Tungsten Mining Corporation (Tungsten) sued Defendant-appellee District 50, United Mine Workers of America (District 50) for damages under Section 303 of the Labor Management Relations Act, 29 U.S.C.A. § 187(a) (3) and 187(b). Tungsten claimed that in January 1953 District 50, through an unlawful strike, caused damage to Tungsten's business; and that the strike was unlawful because one of its objects was to force Tungsten to recognize District 50 as bargaining representative of Tungsten's employees, although at that time United Stone & Allied Products Workers of America, C.I.O. (Stone Workers) was then the labor organization certified by the National Labor Relations Board (Board) as exclusive collective bargaining representative for such employees. At the conclusion of the trial before the district judge, without a jury, judgment was entered in favor of District 50.

In April 1946 the Board conducted an election among Tungsten's employees and issued a certification in favor of Stone Workers. Shortly thereafter, Tungsten and Stone Workers executed a collective bargaining agreement which was followed by an uninterrupted succession of such agreements, the fourth of which was effective until January 15, 1953, and from year to year thereafter unless modified or terminated by 60 day notice. In October 1952 Holloman, an employee [1] in Tungsten's mines, with the help of District 50, organized the Tungsten Mining Local of District 50 at the Tungsten plant and Holloman was elected president of the new local.

While Tungsten Mining Local was being organized and thereafter, meetings were held with Tungsten's employees. At these meetings representatives of District 50 made a series of speeches in which they pointed out that District 50 did not use [2] the facilities of the Board to settle representation questions and that District 50 would probably resort to a strike or series of strikes with picketing if it could not obtain recognition in any other way. After one of these meetings, statements were made by some of the employees that efforts to pass through a picket line might result in houses being dynamited "and things like that."

In October 1952 Robert Fohl, Regional Director of District 50, and Walter A. Shuey and Lucien L. Wood, Field Representatives of District 50, came to Tungsten and conferred with the vice president and general manager of Tungsten. These District 50 representatives asserted that their Union held authorizations from a majority of Tungsten employees. They stated that District 50 did not use the Board's facilities, but offered to have District 50's status verified through other media. They explained that where they were unsuccessful in obtaining representation by other means, they would resort to strike. Purported lists of requests that Stone Workers "no longer be the certified Bargaining Agent at the Tungsten Mining Corporation," of the withdrawal of check-off authorizations

---

1. He had been with Tungsten approximately two years, having started in a supervisory capacity. He began working in the mine, and joined Stone Workers about September-October 1952.

2. United Mine Workers has consistently declined to comply with the filing provisions of 29 U.S.C.A. § 159(f), (g) and (h). This precluded the parent, and District 50, from asking relief from, or being certified by, the Board. It did not, however, preclude District 50 from representing employees or acting as bargaining representative for them. United Mineworkers of America v. Arkansas Oak Flooring Co., 1956, 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed. 941; District 50, United Mine Workers of America v. National Labor Rel. Bd., 4 Cir., 1956, 234 F.2d 565, 571. This is immaterial upon the question of whether District 50 was at liberty to participate in a strike for recognition, if at the time Stone Workers was the certified representative.

on behalf of Stone Workers, and of applications for membership in District 50, were mailed to Tungsten on January 21, 1953.

Shortly after the conference with the District 50 representatives, Tungsten examined its files and finding unrevoked dues deductions authorizations in favor of Stone Workers executed by more than a majority of employees in the unit, advised District 50 that Stone Workers had been certified by the Board as bargaining agent; that this certification had never been rescinded; and that Tungsten would continue to recognize Stone Workers until some other bargaining agent had been properly certified after an election duly held under the National Labor Relations Act. On October 30, 1952, District 50 wrote the Board, with a copy to Tungsten, reviewing in part the claims of District 50 and Tungsten, and concluding:

"We are merely advising your Board of this situation as a matter of record because this Organization intends to fully support and protect the interests and desires of the workers of this Mining Company, by every moral and legal means at our disposal, including that of strike action, if necessary."

In November 1952 Stone Workers notified Tungsten that it wished to terminate the existing contract and proposed that a new contract be negotiated. Because of "raids" on the membership of Stone Workers, an administrator appointed pursuant to the Constitution of Stone Workers International Union, was sent to the plant to endeavor to bring the employees back into Stone Workers' organization. Largely [3] through the administrator's efforts, a new contract between Tungsten and Stone Workers was executed on December 18, 1952, to become effective on January 15, 1953, the terminal date of the current contract. On January 9, 1953 Tungsten discharged two employees, including Holloman, for alleged violation of working rules. They spoke to other employees of the company and a strike began at 6 p. m. At 7 p. m. representatives of District 50 arrived at the Tungsten plant. On January 10, Holloman and Fohl prepared a press release describing the strike as due to a spontaneous walk out because of the discharges which they attributed to union activity on behalf of District 50 by the discharged employees. The release also stated:

"In addition to a strike for the two discharged workers, it will also be a strike for recognition of the United Mine Workers of America and a new contract with proper wages, hours and working conditions from January 15, 1953, on."

"On strike" signs were made available by District 50 to the striking employees and after January 15, signs indicating that the strike was for recognition of District 50 were also supplied.

The strike was accompanied by violence, including the discharge of fire arms and dynamiting of a power pole. On January 14, 1953 the Superior Court of Vance County, North Carolina, issued a temporary restraining order directed against District 50, Holloman and others, enjoining interference with free ingress and egress; assaults, threats, abuse or damage; and also set up provisions with respect to picketing. This order was on the evening of January 14 read by Wood to the strikers, and Wood, in conjunction with State Police, laid out the picket stations in accordance with the order of court.

On January 15, 1953 Tungsten's old contract with Stone Workers expired and District 50 formally adopted the strike for purposes of recognition. Strike headquarters were established at a rented building some distance from the mine. Bail was furnished through District 50

3. The evidence is in conflict as to whether or not this agreement had been reached in New York, without consideration by Stone Workers other than through the administrator, or whether it was the result of real bargaining at Tungsten, in which other representatives of Stone Workers participated.

for persons arrested for acts of violence during the course of the strike. An injunction issued by the district court on February 3, 1953, to which further reference is made in this opinion, brought an end to the strike.

Tungsten's suit was brought under U.S.C.A. Title 29, § 187, the pertinent parts of which read as follows:

"(a) It shall be unlawful, for the purposes of this section only * * * for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike * * * where an object thereof is—

* * * * * *

"(3) forcing or requiring any employer to recognize or bargain with a particular labor organization as the representative of his employees if another labor organization has been certified as the representative of such employees * * *

* * * * * *

"(b) Whoever shall be injured in his business or property by reason or [of] any violation of subsection (a) of this section may sue therefor in any district court of the United States * * *."

Whether or not District 50 induced the employees of Tungsten initially to strike, it certainly encouraged them in the strike, and was itself engaged in the strike at least after January 14, 1953.[4] One of the purposes of the strike was to force or require Tungsten to bargain with District 50 as the representative of Tungsten's employees. During all the time in question, another labor organization, Stone Workers, had been certified by the Board as the exclusive collective bargaining representative of Tungsten's employees. That certification had not and has not been revoked.

The case would seem to come literally and exactly within the coverage of section 187(a) (3) supra. Nevertheless the district court [142 F.Supp. 806] entered judgment for District 50 saying:

"I am adjudging that District 50 is not liable to Tungsten because Stone Workers, despite its certification, was no longer a going concern, nor did it represent the overwhelming majority of Tungsten's employees—a situation of which Tungsten had every reason to be well aware * * *."

The proposition that despite the provision of section 187(a) (3) making unlawful a strike having as "an object" the forcing or requiring of any employer to recognize or bargain with a particular union if another labor organization has been certified as the representative of employees, such strike is not unlawful if the certified union (after one year from its certification) has ceased to represent a majority of the employees in the bargaining unit, was based completely and exclusively upon the decision in Kennedy, Regional Director, National Labor Relations Board v. Warehouse & Distribution Workers Union, Local 688, 37 L.R.R.M. 2496, (D.C.Mo., Jan. 27, 1956). That was an action brought to enjoin an unfair labor practice proscribed by U.S.C.A. Title 29, § 158(b) (4) (c), the language of which is identical with section 187(a) (3).

In the Kennedy case Coca-Cola Bottling Company Salesmen Association (Association) was duly certified as the exclusive bargaining representative of the employees of Coca-Cola Bottling Company of St. Louis, Missouri (Coca-Cola). A collective bargaining agreement was entered into between the Association and Coca-Cola on July 17, 1953 with an expiration date of November 1, 1955. Negotiations for a new contract were begun in June 1955 but no agreement was reached. On September 2,

---

4. The state court injunction of January 14, 1953, enjoined District 50, among others, from interfering with access to Tungsten's property; from the use of violence or threats; and from having more than six pickets posted at specified locations.

1955, Warehouse & Distributors Workers Union, Local 688, (Local 688) filed with the National Labor Relations Board a petition for the election of a collective bargaining representative of the employees of Coca-Cola. Hearings on the petition were held but on October 25, 1955 before a decision had been handed down by the Board, Local 688 made demands on Coca-Cola for immediate recognition as the collective bargaining representative of the employees in Association, the certified unit, and further demanded that Coca-Cola negotiate a new agreement with Local 688 on the threat of a strike and picketing to enforce these demands. A strike was called by Local 688 on November 9, 1955 and pickets were maintained.

Association continued to function after October 24, 1955; Coca-Cola continued deduction of Association's membership dues from Coca-Cola employees wages and Association accepted such payments. Coca-Cola was at all times in possession of written authorizations for the check off of Association dues from a very substantial majority of Coca-Cola's employees, which authorizations had not formally been revoked in writing.

The court in the Kennedy case also found that by October 24, 1955, the Association had lost the support of a majority of the employees in the unit; that a majority had designated Local 688 as their bargaining agent; and that before the strike Coca-Cola, "while it may not have been convinced that" Local 688 "represented a majority of employees in the unit, had good cause to doubt, and did doubt, that the Association retained the support of a majority."

The crux of the decision is found in conclusions of law nos. 4, 5, and 6, quoted in full (except for citations) by the district court in this case, and conclusion no. 7, as follows:

"4. Since the relief sought by petitioner is being denied on other grounds, it is not necessary to consider whether the Association's status, or its representation of the employees in the unit, had deteriorated to such an extent that the Association's certification should for this reason be regarded as totally ineffective. Cf. Public Service Electric & Gas Co., 59 N.L.R.B. 325, 15 LRRM 152; WTOP, Inc., 114 N.L.R.B. No. 194, 37 LRRM 1143; National Gas Co., 106 N.L.R.B. 819, 32 LRRM 1561; but cf. Cosentino v. District Council, D.C.P.R., 107 F.Supp. 235, 30 LRRM 2683.

"5. Because the Association had, by November 9, 1955, when the Association's certification was more than one year old, lost the support of a majority of the employees in the bargaining unit, and the Company had at least a bona fide doubt that the Association retained the support of a majority, the Company was then no longer required by law to bargain collectively with the Association, but was free to 'refuse to bargain further with it.' Brooks v. National Labor Relations Board, 348 U.S. 96, 104, 75 S.Ct. 176, 99 L.Ed. 125, 35 LRRM 2158; Celanese Corp., 96 N.L.R.B. 644. An object of Respondent's conduct, therefore, was to require the Company to violate its duty of neutrality between the Association and Respondent, e. g. National Labor Relations Board v. Indianapolis Newspapers, Inc., 7 Cir., 1954, 210 F.2d 501, 503, 33 LRRM 2536, not to require the Company to violate its duty to bargain with the certified union.

"6. Section 8(b) (4) (c) of the Act proscribes strikes 'having as their purpose forcing any employer to disregard his obligation to recognize and bargain with a certified union and in lieu thereof to bargain with or recognize another union.'[5] H.Conf.Rep. No. 510, 80th Cong.,

---

5. The quotation is not of the statutory provision, but from House Conference Report No. 510, 80th Cong., 1st Sess.

The consequence of ignoring the statutory language is discussed in detail below.

1st Sess.; see also S.Rep. No. 105, 80th Cong., 1st Sess.; 93 Daily Cong.Rec. 7686; id. at 1910–1912, 3954. That section does not, as the Board contends, proscribe strikes directed toward compelling the employer to violate his duty of neutrality between two competing unions, nor does it proscribe strikes to gain an object (recognition) which could alternatively be gained, eventually, by means of the peaceful processes of the Board's election procedures, for it is not written in those terms, and there is no rational relation between these circumstances and the criterion established by the Act: whether 'another labor organization has been certified as the representative of (the) employees under the provisions of Section 9.' A strike is not rendered unlawful by the presence of such circumstances. See, e. g., Perry Norvell Co., 80 N.L.R.B. 225, 23 LRRM 1061; Tungsten Mining Corp., 106 N.L.R.B. 903, 909, 32 LRRM 1576; Address of former General Counsel Bott. May 13, 1954, 34 LRRM 78, 79; cf. S.Rep. No. 105, 80th Cong., 1st Sess., p. 22; H.Conf.Rep. No. 510, 80th Cong., 1st Sess., 43, 44; 98 Daily Cong.Rec. 4557, 4562–63. Accordingly Section 8(b) (4) (c) does not proscribe the conduct of Respondent in this case.

"7. The fact that Respondent's representation petition was already pending at the time of the strike does not render Respondent's conduct unlawful, because this circumstance has no bearing upon the terms of Section 8(B) (sic) (4) (C), and a contrary rule would discourage, rather than encourage, resort by the union to the peaceful election procedures of the Board."

After referring to these conclusions, the district judge in this case then pointed out that in District 50, United Mine Workers of America v. National Labor Rel.Bd., 4 Cir., 1956, 234 F.2d 565, this court had stated, with reference to a situation in which there was no certified union, that the maintenance of neutrality does not *"require* [6] that the employer refuse to recognize a bargaining agent chosen by a majority of his employees if such majority is so clearly established that there can be no true question with regard thereto." (234 F.2d at page 570). At almost the same time the Supreme Court, in another case not involving a certified union, the company's employees never having been represented by a union, held that upon proof of a majority "The company can, if it so wishes, lawfully recognize the union as the employees' representative." United Mine Workers of America v. Arkansas Oak Flooring Co., 1956, 351 U.S. 62, 75, 76 S.Ct. 559, 567, 100 L.Ed. 941.[7]

The district judge then referred to the *"right* of the employer" as a general rule, where the certification is more than one year old, to recognize another union holding a majority; expressed the opinion that "Tungsten was at *liberty"* to recognize District 50 upon clear proof of majority representation by it; and that Tungsten was *"free to recognize* District 50 in spite of the Board's cer-

---

6. Emphasis here and throughout supplied, unless otherwise indicated.

7. The language immediately following is: "That being so, there is no reason why the employees, and their union under their authorization, may not, under section 13, strike,[13] and, under § 7, peacefully picket the premises of their employer to induce it thus to recognize their chosen representative. See West Texas Utilities Co. v. National Labor Relations Board, 87 U.S.App.D.C. 179, 185, 184 F.2d 233, 239, and the other cases cited in note 6, supra.[14]" That this was spoken only in connection with the specific factual situation, in which there was no certified union, is made abundantly clear by the Supreme Court's footnote 14, reading:

"14. 'Present law in no way limits the primary strike for recognition except in the face of another union's certification.' Report of the Joint Committee on Labor-Management Relations, No. 986, Pt. 3, 80th Cong., 2d Sess. 71; S.Rep. No. 105, 80th Cong., 1st Sess. 22; H.R.Conf.Rep. No. 510, 80th Cong., 1st Sess. 43."

tification of Stone Workers, but Tungsten preferred a contrary course, taking the position that it would recognize only a union certified by the N.L.R.B." [142 F.Supp. 805]

The district court then paraphrased the Kennedy decision and held that the object of District 50 was not "to force Tungsten to disregard its obligation to Stone Workers" but "to get Tungsten to realize and accept the fact that it was at that time *under no obligation* to Stone Workers * * *." This, the court held, relieved District 50 of liability under section 187(b)—although the strike was, at least in part, for recognition.[8]

In Parks v. *Atlanta Printing Pressman & Assistants Union No. 8*, D.C.Ga., 150 F.Supp. 246, the court dismissed an action for damages for alleged violation of section 187(a) (3). The court found that the certified union had been quite inactive; there had been no labor agreement for the years 1953, 1954, or 1955; no grievances had been processed; and while a wage increase had been negotiated in 1953, the certified union had not since that date attempted to bargain with the employer; and that it did not represent a majority. The court referred to the "difficult question * * * whether the defendant union in this case was justified in calling the strike for recognition, more than a year after the other election, without obtaining a certification by the National Labor Relations Board of its status." The court referred to the Fifth Circuit decision in National Labor Relations Board v. International Furniture Co., 5 Cir., 212 F.2d 431, that "the employer has a right to refuse recognition after the year [of certification] has passed where the refusal arises from a belief in good faith

that the union does not represent a majority of the employees." (212 F.2d at page 433). The court also cited the Kennedy case, supra, and Brooks v. National Labor Relations Board, 1954, 348 U.S. 96, 104, 75 S.Ct. 176, 181, 99 L.Ed. 125, and the statement by the Supreme Court that:

"The Board has ruled that one year after certification the employer can ask for an election, or if he has fair doubts about the union's continuing majority, he may refuse to bargain further with it. This, too, is a matter appropriately determined by the Board's administrative authority."[9]

The court in the Parks case recognized that "There is much language in" National Labor Relations Board v. Sanson Hosiery Mills, Inc., 5 Cir., 1952, 195 F. 2d 350 "leading one to believe that the certification must be respected even after a year has passed." The court attempted, however, to distinguish the case on the ground that it related to a situation arising at a time when certification was held inviolable for two years.

In the Kennedy case; in the court below; and to some extent in the Parks case, the courts proceed upon the theory that if, after the period of one year, substantial evidence exists that the certified union no longer represents a majority, the employer *may*, without awaiting formal decertification, refuse further to deal with the certified union; that if there is substantial evidence that a rival union does represent a majority, the employer *must* on demand of such rival cease recognizing the certified union and deal with the rival; and if he does not, the rival can cause or participate in a strike to bring that condition about;

---

**8.** The district judge found: "On January 15, 1953, Tungsten's old contract with Stone Workers expired and District 50 formally adopted the six day old strike *for the purpose of getting recognition.*"

**9.** The Supreme Court's footnote to this quotation is:

"18. Celanese Corp. of America, 95

N.L.R.B. 664. The Board has on several occasions intimated that even after the certification year has passed, the better practice is for an employer with doubts to keep bargaining and petition the Board for a new election or other relief. Id., at 674; United States Gypsum Co., 90 N.L. R.B. 964, 966–968; see also J. P. O'Neil Lumber Co., 94 N.L.R.B. 1299."

but that this is not "forcing or requiring any employer to recognize or bargain with" the rival union, whether or not another union has been and is the certified collective bargaining agent.

We are not impressed with the inevitability of this reasoning or conclusion. It is founded upon the quotation and use by the court in the Kennedy case (conclusion of law no. 6, supra) of language from a House Conference Report instead of the language of the Act as passed. The court says that "Section 8(b) (4) (C) of the Act proscribes strikes 'having as their purpose forcing any employer to disregard his obligation to recognize and bargain with a certified union and in lieu thereof to bargain with or recognize another union' * * *" The language of 8(b) (4) (C), (29 U.S.C.A. § 158(b) (4) (C)), in haec verba proscribes strikes "forcing or requiring any employer to recognize or bargain with a particular organization as the representative of his employees if another labor organization has been certified as the representative of such employees * * *."

The risk in glossing clear and simple language by reference to legislative history is strikingly illustrated by the substitution of words from House Conference Report No. 510 for the statutory language. Later, in speaking of the Senate amendment (in which the House concurred) this same House Conference Report No. 510 refers to the investigation by the Board of "any charge of unfair labor practice within the meaning of paragraph (4) (A), (B), or (C) of section 8(B) of the conference agreement, which deals with certain boycotts and with certain strikes *to force recognition of uncertified labor organizations * * *.*" [10] Finally, in a footnote to the decision in Mine Workers of America v. Arkansas Oak Flooring Co., supra, 351 U.S. at page 75, 76 S.Ct. at page 567, the Supreme Court stated: "Present law in no way limits the primary strike for recognition *except in the face of another union's certification*," citing, among other references, this same House Conference Report No. 510.

The Fifth Circuit flatly held in National Labor Relations Bd. v. Sanson Hosiery Mills, 1952, 195 F.2d 350, 352, certiorari denied 1952, 344 U.S. 863, 73 S.Ct. 103, 97 L.Ed. 669, that "a certification, when lawfully made, must be respected by the employer until changed conditions are reflected by a later ruling by the Board altering or setting aside the certification. This is true, even though the bargaining agent so designated has lost its majority representation of the employees * * *"; "Nor can the employer decide for itself whether the Union has lost its bargaining status, and deciding that it has, refuse to deal with it further. Whether or not the Union has lost that status is for the Board to determine upon orderly statutory procedure. N. L. R. B. v. Prudential [Ins. Co.], 6 Cir., 154 F.2d 385, headnote 10. Meanwhile it is the duty of the employer to deal with the duly certified union." (195 F.2d at pages 352–353).[11]

---

10. U.S.Code Cong.Service, 80th Cong. 1st Sess., 1947, p. 1163.

11. This decision was followed in several cases by the Fifth Circuit until its decision in National Labor Relations Bd. v. International Furniture Co., 1953, 212 F.2d 431, at page 433, where in enforcing an order of the Board requiring an employer to bargain in good faith with the certified union, and the only one in the picture, where the employer as an afterthought had raised the question of loss of majority representation, that court said:

"While there is a presumption that the majority status of the union continues after the year of certification, the employer has a *right to refuse recognition* after the year has passed where the refusal arises from a belief in good faith that the union does not represent a majority of the employees * * *."

In Cone Brothers Contracting Co. v. National Labor Rel. Bd., 5 Cir.1956, 235 F.2d 37, 42, the employer was so doubtful concerning the validity of the Board-held election that it took "the forthright, albeit risky, course of declining to bargain as the means of testing its convictions. * * * But in doing this, the Employer anticipated, as it came to pass, that the soundness of its claim of ille-

In Teamsters Union and Lewis Food Company, 115 N.L.R.B. 890, 37 LRRM 1421 (March 22, 1956), the Board issued a cease and desist order from engaging in unlawful picketing for recognition. On July 22, 1952, Association of Pet Food Manufacturers Employees was certified as bargaining representative of employer's production and maintenance employees. On September 11, 1952, a collective bargaining contract was executed, to expire in 1957. In August 1954, Teamsters Union began organizing employees in the certified bargaining unit, and by August 18 claimed a majority, demanded recognition and a contract, and stated that employer should join with the union in filing a petition with the Board to decertify the Association. Upon failure of the employer to comply, a strike was called. The Board found this to be a violation of section 158(b) (4) (C) since it was designed to force the employer "to recognize" Teamster's Union "and bargain with it at a time when the unit of employees for which" Teamsters Union "sought recognition was covered by an outstanding certification existing in the Association." The Board also affirmed the rejection of Teamsters Union's affirmative defense that the strike was not violative of section 158(b) (4) (C) "because the Association allegedly was illegally dominated at the time of its certification   *   *   *" Presumably this, as loss of majority representation, while the basis for a decertification, could not in the Board's opinion permit a rival union to strike while the certification was outstanding.

But even if we should assume, concede, or agree, that after the first certification year an employer, if there be substantial evidence that the certified union has lost majority representation, *may* recognize a rival union, "may" is certainly not the equivalent of "must". To hold that an employer must cease recognition of a certified union, and recognize a rival, would seem totally inconsistent with the representation provisions of 29 U.S.C.A. § 159(c) (1) (B) under which a petition may be filed "by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the" exclusive representative.[12] It also would be inconsistent with the admonitory language of the Supreme Court in Brooks v. National Labor Relations Board, 1954, 348 U.S. 96, at pages 103–104, 75 S.Ct. 176, at page 181, 99 L.Ed. 125, where the *court said:*

"Petitioner contends that whenever an employer is presented with evidence that his employees have deserted their certified union, he may forthwith refuse to bargain. In effect, he seeks to vindicate the rights of his employees to select their bargaining representative. If the employees are dissatisfied with their chosen union, they may submit their own grievance to the Board. If an employer has doubts about his duty to continue bargaining, it is his responsibility to petition the Board for relief, while continuing to bargain in good faith at least until the Board has given some indication that his claim has merit.[13] *Although the Board may, if the facts warrant, revoke a certification* or agree not to pursue a charge of an unfair labor practice, *these are matters for the Board; they do not justify employer*

gality would be determined in the inevitable (and present) Complaint Proceeding and not by self-help which would be condemned, * * *."

12. It might also completely eliminate the invocation of sec. 159(c) (1) (A) under which a petition may be filed "by an employee or group of employees * * * alleging that a substantial number of employees * * * (ii) assert that the

individual or labor organization, *which has been certified* or is being currently recognized by their employer as the bargaining representative, is no longer a representative * * *."

13. At the time the strike occurred, Tungsten officials were conferring at the Winston-Salem Regional Office of the Board, "to talk with them about this situation * * *"

*self-help or judicial intervention.* The underlying purpose of this statute is industrial peace. *To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it. Congress has devised a formal mode for selection and rejection of bargaining agents* and has fixed the spacing of elections, with a view of furthering industrial stability and with due regard to administrative prudence.

"We find wanting the arguments against these controlling considerations. In placing a nonconsenting minority under the bargaining responsibility of an agency selected by a majority of the workers, Congress has discarded common-law doctrines of agency. It is contended that since a bargaining agency may be ascertained by methods less formal than a supervised election, informal repudiation should also be sanctioned where decertification by another election is precluded. This is to make situations that are different appear the same."

The facts in the present case point up the risks inherent in the application of the theory that the employer would be entitled, or required, itself to determine correctly the wishes of its employees to reject a certified bargaining agent. It may be clear that a substantial majority of Tungsten's employees on paper favored District 50. Against this must be placed the facts that until January 22, 1954, no written evidence in support of this claim was in Tungsten's hands—indeed, it held unrevoked dues deduction authorizations in favor of Stone Workers, executed by more than a majority of its employees; it had paid in January 1954 the amount of such deductions to the administrator of Stone Workers for December 1953 deductions; the administrator of Stone Workers testified that

upon coming to the plant he tried to rebuild that union from the raids upon it, and thought he had some success from the start; in fact, Stone Workers continued in existence down to the time of trial, February, 1956, at which time it had a contract with Tungsten, negotiated at the end of 1955, expiring January 15, 1958, and represented between seventy-five and eighty percent of Tungsten's employees; and, in proceedings before the National Labor Relations Board in 1954, Stone Workers was found to be the certified and functioning representative of Tungsten's employees. Add to this the fact that the authorizations relied upon by District 50 [14] had been obtained in association with threats of strike and violence (which materialized), and it cannot be said that Tungsten acted improperly or unlawfully in insisting upon a properly supervised secret ballot to determine the real, uncoerced wishes of its employees.

We hold that under these circumstances Tungsten was not legally obligated to recognize District 50 as the bargaining agent of its employees, in view of the outstanding certification of Stone Workers.

The appropriate Regional Director for the Board brought suit pursuant to 29 U.S.C.A. § 160(*l*) in the United States District Court for the District of North Carolina, for an injunction against Tungsten Local Union, United Mine Workers of America, Holloman, Fohl and District 50, United Mine Workers of America, "pending final adjudication of the Board of the matters involved." The court issued a decree, dated February 3, 1953, "upon consideration of the petition, respondents' oral answer thereto in open court, testimony, exhibits, evidence, oral arguments and briefs" from which it appeared to the satisfaction of the court "that there is reasonable evidence to believe that respondents have engaged in and are engaging in conduct in violation of Section 8(b), sub-section (4) (C)"

14. The reported cases, Board and court, attest the mercurial character of union membership, particularly where a new union enters the lists.

of the National Labor Relations Act. The respondents were accordingly "restrained and enjoined, pending the final adjudication of this matter by the National Labor Relations Board." from:

"Engaging in, or by picketing, order, instructions, directions, appeals, threats, intimidation, coercion or by any like or related acts or conduct, or by permitting any such to remain in existence or effect, inducing or encouraging the employees of the Tungsten Mining Corporation, or of any other employer, to engage in a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials or commodities, or to perform any services, where an object thereof is to force or require the said Tungsten Mining Corporation to recognize or bargain with respondent Tungsten Local Union. United Mine Workers of America, and/or respondent District 50, United Mine Workers of America, as the collective bargaining representative of any of the employees of said corporation in the unit for which the United Stone and Allied Products Workers of America, C.I.O. has been duly certified by the Regional Director of the National Labor Relations Board as the exclusive bargaining representative under the provisions of Section 9 of the National Labor Relations Act."

Respondents were further required to prepare and deliver press releases "stating that respondents have rescinded and withdrawn their demand that the Tungsten Mining Corporation shall recognize or bargain with respondents or any of them * * * and that respondents have directed their members to cease their strike and picketing at the mine and plant of the Tungsten Mining Corporation for the prescribed object above described * * *"

The following notice was given to members of Tungsten Local, District 50 United Mine Workers of America, and for release to the press and radio:

"Notice is hereby given that on February 3, 1953, Judge Don Gilliam issued an order, a copy of which is herewith attached for your information and guidance.

"Under the order District 50, UMWA, has no choice but to direct its members at Tungsten to 'cease their strike and picketing at the mine and plant * * * to force or require the said Tungsten Mining Corporation to recognize or bargain with * * * Tungsten Local * * * as the collective bargaining representative of any of the employees of said corporation in the unit for which' another union has been certified, which District 50 or its agents hereby does as directed. Under said order District 50 is commanded to withdraw its demand for recognition by the Corporation for collective bargaining purposes, which it likewise hereby does.

"District 50, UMWA, intends to comply with the terms and conditions of this order or decree.

"This 3rd day of February, 1953.

"District 50, United Mine Workers of America

"By /s/ Robert R. Fohl
"Regional Director
"/s/ Cordell Holloman"

On August 26, 1953, the Board issued its Decision and Order, 106 N.L.R.B. 903, In the Matter of District 50. United Mine Workers of America; Tungsten Mining Local of the United Mine Workers of America; Robert R. Fohl, Director, Region 19, District 50, United Mine Workers of America; William Cordell Holloman, President Tungsten Mining Local, United Mine Workers of America and Tungsten Mining Corporation. Whether or not respondents (other than Tungsten) had engaged in unfair labor practices directly required a decision as to whether Stone Workers was at the time of the strike a certified union under

Section 8(b) (4) (C) of the Act, and that this question of certification status at the time of the strike was directly involved and decided, is made abundantly clear from the following quotation [15] from the decision (106 N.L.R.B. 905–906):

"As stated above, Stone Workers was certified by the Board as the bargaining representative of the Company's employees in May 1946, and the strike for the recognition of the UMW occurred in January 1953. At issue before the Board, therefore, is whether Stone Workers was, at the time of the strike, still a 'certified' labor organization within the meaning of the quoted language of Section 8(b) (4) (C).

"That language places no time limitation on the duration of a certification otherwise entitled to the protection of that section. Nor does the legislative history of the Act reveal that the Congress intended, or even considered, such a limitation.[a]

"The Respondents, however, contend in effect that the language of the statute should not be applied in this case. They argue that Stone Workers' certification was not valid in 1953 because 'the strike and majority participation [in the UMW] rebuts any presumption of such continued existing certification.' This contention is apparently founded upon the Board's doctrine with respect to an employer's obligation to bargain under Section 8(a) (5) of this Act. In that context, the Board has held that the majority status of a certified union, absent unusual circumstances, is conclusively presumed to continue for 1 year after certification; thereafter, the pre-

sumption is rebuttable and the employer may in good faith question the union's majority status.[b]

"We need not, however, here decide whether or not this doctrine is applicable to Section 8(b) (4) (C) of the Act. For even were we to concede that point, the Respondents' contention still would have no merit. There is no evidence in the record to show, as the Respondents assert, that a majority of the Company's employees participated in the recognition strike. The evidence shows only that there was a strike, that the Company continued to operate its mine, and that a number of employees did not participate in the strike. There is nothing else to show that UMW was the representative of a majority of the Company's employees either before or during the strike. In this connection, the record shows only that a bare claim was pressed upon the Company that the UMW represented the majority of its employees, but no supporting evidence thereof was adduced. Indeed, the only evidence there is on the question consists in the voluntary authorization of dues checkoffs in favor of Stone Workers, which supports, rather than rebuts, the presumption that the Stone Workers continued to be the majority representative of the Company's employees at the time of the strike.

"We need not and do not here determine whether there are any circumstances under which a union may lawfully strike for recognition if another union has once been granted a certificate which has not been superseded or revoked. We hold that, un-

15. Footnotes 1, 2, and 3 to the Board's decision have, to avoid confusion with the footnotes to this opinion, been renumbered a, b and c respectively.

"a The history of the provision indicates only that Section 8(b) [4] (C) was intended to proscribe conduct, such as a strike, which bypasses the Board's machinery for the peaceful settlement of disputed representation questions. See H.R.Rep. No. 245, 80th Cong., 1st Sess. pp. 6, 44 (1947)."

"b See, e. g., Celanese Corporation of America, 95 NLRB 644."

der the circumstances of this case, the certification was still outstanding and the strike for recognition was a clear violation of Section 8(b) (4) (C).ᶜ"

The Board then found that all respondents (other than Tungsten) were responsible "on and after January 10, for conducting a strike for recognition of UMW, thereby violating Section 8(b) (4) (C) of the Act," and that they were responsible for coercive acts, thus violating Section 8(b) (1, 4) of the Act. These respondents were ordered to cease and desist from (106 N.L.R.B. at p. 909):

"(a) Engaging in, or inducing or encouraging the employees of the Tungsten Mining Corporation to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or to perform any services, where an object thereof is to force or require the Tungsten Mining Corporation to recognize or bargain with District 50, United Mine Workers of America, or with Tungsten Mining Local of United Mine Workers of America, or with United Mine Workers, as the representative of the employees of said Company, so long as United Stone and Allied Products Workers of America, CIO, or any labor organization other than District 50, United Mine Workers of America or Tungsten Mining Local of United Mine Workers of America, has been certified as the representative of such employees under the provisions of Section 9 of the Act."

The Order was enforced by a decree of this court entered without opinion on March 19, 1954.[16] The Order and Decision of the Board of August 26, 1953, and the decree of this court enforcing the Board's order, were not mentioned by the district judge in his opinion. In fact, the court struck from plaintiff's complaint herein all references to the proceedings before the Board on the ground that such allegations[17] were "irrelevant, immaterial and improper, and evidence in support of them would be inadmissible on the trial * * *" That court's own injunction of February 3, 1953, is referred to only as part of the statement of facts.[18]

In the absence of any explanation of record, we are forced to assume that the district judge considered that a decision by the Board on the question of the status of Stone Workers, as a certified union, at and during the strike, was not binding in a subsequent civil action for damages. It may be granted that there was no estoppel, as that term is technically defined,[19] in the Decision of the

"ᶜ Chairman Farmer is of the view that a union which strikes for recognition in the face of an outstanding certification—which is still recognized as valid by the employer and certified union—has no standing to contest the majority status of the certification. He is of the opinion that the statutory prohibition expressed in Section 8(b) (4) (C) was intended in these circumstances to be absolute."

16. District 50 did not, in the enforcement proceedings before this court, contest the Decision and Order of the Board, but contended that the Board's petition for enforcement should be denied because:
"1. The question is moot, and
"2. There has already been substantial compliance by [District 50] with the Board's order."

17. These allegations related to the determination by the Board that District 50 had been guilty of an unfair labor practice. No specific reference was made to the certification question, although the complaint alleged that District 50 was "bound by the said decision and all findings and conclusions therein * * *"

18. "A federal injunction was issued by this court on February 3, 1953, at which time the strike ended and representatives of District 50 sent copies of the injunction to all on strike, posted notices of it, and left the scene for good."

19. But see A.L.I. Restatement, Judgments, sec. 68(1), comments c, e, o, p; Sec. 69 (1).

Board. Nevertheless, the Board was required to, and did, make a specific finding of fact on a matter within its jurisdiction. The Order, based upon such finding, was enforced by this court.

The point for decision here was not involved in International Longshoremen's & Warehousemen's Union v. Juneau Spruce Corp., 1952, 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275. In that case the court held that a finding by the Board of an unfair labor practice through illegal picketing under Section 8(b) (4) (D) was not a condition precedent to an action for damages under Section 303(a) (4). It was in this connection that the court said, (342 U.S. at pages 243–244, 72 S.Ct. at page 239): "Section 8(b) (4) (D) and § 303(a) (4) are substantially identical in the conduct condemned. Section 8(b) (4) (D) gives rise to an administrative finding; § 303(a) (4) to a judgment for damages. The fact that the two sections have an identity of language and yet specify two different remedies is strong confirmation of our conclusion that the remedies provided were to be independent of each other. Certainly there is nothing in the language of Sec. 303(a) (4) which makes its remedy dependent on any prior administrative determination that an unfair labor practice has been committed. Rather, the opposite seems to be true * * *."

■ But the issuance, and revocation, of certifications is entrusted expressly and solely[20] to the National Labor Relations Board, subject to judicial review in suits to enforce unfair labor practice orders. In this case, the Board determined that at the times in question, Stone Workers' "certification was still outstanding" within the meaning of Section 8(b) (4) (C).

In United Brick & Clay Workers of America v. Deena Artware, 6 Cir., 1952, 198 F.2d 637, certiorari denied 1952, 344 U.S. 897, 73 S.Ct. 277, 97 L.Ed. 694, rehearing denied 1953, 344 U.S. 919, 73 S.Ct. 346, 97 L.Ed. 708, the court held that in a suit under Section 303(b) a jury question was presented as to whether picketing by United was against Deena, and the purpose thereof. This "main issue" was "one of the issues involved collaterally" (198 F.2d at page 639) in National Labor Relations Board v. Deena Artware, 6 Cir., 1952, 198 F. 2d 645, in which the court enforced an order of the Board requiring Deena to cease and desist from interference and refusal to bargain. The same alleged secondary boycott, the basis of recovery in 198 F.2d 637, was urged by Deena as a defense in 198 F.2d 645. The court disagreed with the "ruling of the Board as a matter of law, and are of the opinion that whether the Union was guilty of a 'secondary boycott' * * * was a factual question * * *. The Examiner found for the Union. The finding is supported by substantial evidence on the record considered as a whole, and is accepted on this review * * *." (198 F.2d at page 653).

In noting the inconsistency of the findings (after stating that "the issues presented by the two cases are not the same," 198 F.2d at page 639), the court pointed out that the proceedings were heard by different fact finding agencies; the witnesses were not the same; and the cross-examination was by different attorneys.

Apart from the fact that the Board is the only body authorized to certify or

---

20. Sunshine Anthracite Coal Co. v. Adkins, 1940, 310 U.S. 381, 404, 60 S.Ct. 907, 917, 84 L.Ed. 1263:

"Furthermore, where * * * Congress has created a special administrative procedure for the determination of the status of persons or companies under a regulatory act and has prescribed a procedure which meets all requirements of due process, that remedy is exclusive. See Anniston Manufacturing Co. v. Davis, 301 U.S. 337, 57 S.Ct. 816, 81 L.Ed. 1143."

decertify, there is an element in this case distinguishing it from any that have been called to our attention or disclosed by our own research. In this case it was stated by District 50's attorneys that in the hearing before the Board at which time the question was whether Stone Workers was a certified union within the meaning of the Act, and when the questions of majority status, and whether Stone Workers was a defunct union were involved, District 50 deliberately refrained from offering the very evidence (alleged requests that Stone Workers "no longer be the certified Bargaining Agent at the Tungsten Mining Corporation"; membership applications and check-off authorizations to District 50; and revocation of "voluntary dues assignment" to Stone Workers) relied upon as a defense to the damage suit.

We hold that under the facts of this particular case the deliberate withholding from the Board,[21] the body to which is entrusted the revocation of certifications, and procedure through which is the "formal mode for selection and rejection of bargaining agents" (Brooks v. National Labor Relations Board, 348 U.S. at page 103, 75 S.Ct. at page 181; National Labor Relations Bd. v. Sanson Hosiery Mills, supra, 195 F.2d at pages 352–353) of these "facts" relied upon as a defense below, binds District 50, and prevents it from successfully defending this suit on the ground that at the times in question Stone Workers was not the certified bargaining agent of Tungsten's employees within the meaning of Section 303(a) (3). As a consequence, the strike, and District 50's participation therein, were unlawful.

In remanding the case for further proceedings, we of course intimate no opinion on what, if any, damages are recoverable.

Reversed and remanded.

21. And therefore from this court in considering the Board's petition for enforcement of its order, the "transcript of the

entire record in the proceedings" before the Board being before this court. 29 U.S.C.A. § 160(e).