# UNITED MINE WORKERS OF AMERICA et al. v. ARKANSAS OAK FLOORING CO.

No. 227. Argued January 23, 1956.—Decided April 23, 1956.

*Crampton Harris* argued the cause for petitioners. With him on the brief were *James I. McCain, Yelverton Cowherd* and *Alfred D. Treherne.*

*John L. Pitts* argued the cause for respondent. With him on the brief were *Grove Stafford* and *Richard C. Keenan.*

*Solicitor General Sobeloff, Theophil C. Kammholz, David P. Findling, Dominick L. Manoli* and *Norton J. Come* filed a brief for the National Labor Relations Board, as *amicus curiae,* urging reversal.

MR. JUSTICE BURTON delivered the opinion of the Court.

The question before us is whether, in the case of an employer subject to the National Labor Relations Act, as amended, a state court may enjoin peaceful picketing of the employer's premises, undertaken by its employees and their union for the purpose of obtaining recognition of that union as the employees' bargaining representative, when the union holds cards authorizing such representation concededly signed by a majority of the employees eligible to be represented, but has filed none of the data or affidavits described in § 9 (f), (g) and (h) of that

Act, as amended.[1]  For the reasons hereafter stated, our answer is in the negative.

In 1953, the respondent, Arkansas Oak Flooring Company, a Delaware corporation with its main office in Pine

---

[1] "SEC. 9. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: . . . .

.        .        .        .        .

"(f) No investigation shall be made by the Board of any question affecting commerce concerning the representation of employees, raised by a labor organization under subsection (c) of this section, and no complaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 10, unless such labor organization and any national or international labor organization of which such labor organization is an affiliate or constitutent unit (A) shall have prior thereto filed with the Secretary of Labor copies of its constitution and bylaws and a report, in such form as the Secretary may prescribe, showing—

"(1) the name of such labor organization and the address of its principal place of business;

"(2) the names, titles, and compensation and allowances of its three principal officers and of any of its other officers or agents whose aggregate compensation and allowances for the preceding year exceeded $5,000, and the amount of the compensation and allowances paid to each such officer or agent during such year;

"(3) the manner in which the officers and agents referred to in clause (2) were elected, appointed, or otherwise selected;

"(4) the initiation fee or fees which new members are required to pay on becoming members of such labor organization;

"(5) the regular dues or fees which members are required to pay in order to remain members in good standing of such labor organization;

"(6) a detailed statement of, or reference to provisions of its constitution and bylaws showing the procedure followed with respect to, (a) qualification for or restrictions on membership, (b) election of officers and stewards, (c) calling of regular and special meetings, (d) levying of assessments, (e) imposition of

Bluff, Arkansas, owned and operated a sawmill and flooring plant in Alexandria, Louisiana. The company was there engaged in interstate commerce and subject to the National Labor Relations Act, as amended. At the same

> fines, (f) authorization for bargaining demands, (g) ratification of contract terms, (h) authorization for strikes, (i) authorization for disbursement of union funds, (j) audit of union financial transactions, (k) participation in insurance or other benefit plans, and (l) expulsion of members and the grounds therefor;

"and (B) can show that prior thereto it has—

> "(1) filed with the Secretary of Labor, in such form as the Secretary may prescribe, a report showing all of (a) its receipts of any kind and the sources of such receipts, (b) its total assets and liabilities as of the end of its last fiscal year, (c) the disbursements made by it during such fiscal year, including the purposes for which made; and
> "(2) furnished to all of the members of such labor organization copies of the financial report required by paragraph (1) hereof to be filed with the Secretary of Labor.

"(g) It shall be the obligation of all labor organizations to file annually with the Secretary of Labor, in such form as the Secretary of Labor may prescribe, reports bringing up to date the information required to be supplied in the initial filing by subsection (f)(A) of this section, and to file with the Secretary of Labor and furnish to its members annually financial reports in the form and manner prescribed in subsection (f)(B). No labor organization shall be eligible for certification under this section as the representative of any employees, and no complaint shall issue under section 10 with respect to a charge filed by a labor organization unless it can show that it and any national or international labor organization of which it is an affiliate or constituent unit has complied with its obligation under this subsection.

"(h) No investigation shall be made by the Board of any question affecting commerce concerning the representation of employees, raised by a labor organization under subsection (c) of this section, and no complaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 10, unless there is on file with the Board an affidavit executed contemporaneously or within the preceding twelve-month period by each officer of such labor organization and the officers of any national or international

time, District 50, United Mine Workers of America, here called the "union," was an unincorporated labor organization which undertook to organize the company's eligible employees at its Alexandria plant. The union, however, did not file with the Secretary of Labor any of the financial or organizational data described in § 9 (f) and (g) of the National Labor Relations Act, as amended, nor, with the National Labor Relations Board, any of the non-Communist affidavits described in § 9 (h) of that Act. It contended that the company, nevertheless, should recognize it as the collective-bargaining representative of the Alexandria plant employees because it was authorized by more than a majority of such employees to represent them.

Although for four years there had been no labor organization representing the plant employees, this union, by February 24, 1954, held applications for membership from 174 of the 225 eligible employees. Such applicants had elected officers and stewards and had authorized the union organizer to request the company to recognize the union as their collective-bargaining representative. On February 24, the organizer, accordingly, presented that request to the assistant superintendent of the plant. The latter, in the absence of any higher officer of the company, replied that the union was not recognized either by the National Labor Relations Board or by him, and that, if negotiations were desired, the union organizer should call the company's office at Pine Bluff.

labor organization of which it is an affiliate or constituent unit that he is not a member of the Communist Party or affiliated with such party, and that he does not believe in, and is not a member of or supports any organization that believes in or teaches, the overthrow of the United States Government by force or by any illegal or unconstitutional methods. The provisions of section 35 A of the Criminal Code shall be applicable in respect to such affidavits." 61 Stat. 143, 145–146, 65 Stat. 602, 29 U. S. C. § 159 (a), (f), (g) and (h).

On March 1, the petitioning employees struck for recognition of the union and set up a peaceful picket line of three employees. Two were placed in front of the plant and one at the side. They carried signs stating "This Plant is on Strike" or "We want Recognition, District 50 UMWA."

On March 2, respondent sought a restraining order and injunction in the Ninth Judicial District for the Parish of Rapides, Louisiana. That court promptly issued an order restraining the above-described picketing by 11 named employees, the union and its organizer. The order was obeyed but the strike continued. On March 12 and 15, evidence was introduced, including, by that date, 179 applications for membership in the union, each of which authorized the union to represent the signer in negotiations and in the making of agreements as to wages, hours and conditions of work. The parties to the proceeding stipulated that each of those applications was signed by an employee of respondent. In the face of that record, the court nevertheless converted its restraining order into a temporary injunction and the defendants, who are the petitioners herein, appealed to the Supreme Court of Louisiana. While that appeal was pending, the trial court, on the same record, made its injunction permanent. Petitioners appealed that decision to the Supreme Court of Louisiana and the two appeals were consolidated. There the permanent injunction was sustained, one judge concurring specially and another dissenting, in part, on an issue not material here. 227 La. 1109, 81 So. 2d 413.

The State Supreme Court's ground for sustaining the injunction was that the union, which sought to be recognized, had failed to file with the Secretary of Labor the financial and other data required by § 9 (f) and (g), and had failed to file with the Labor Board the non-Communist affidavits required by § 9 (h). The court held that the union, by failing to comply with § 9 (f), (g) and (h),

had precluded its certification by the Board, and that, accordingly, neither the employees nor the union had a right to picket the plant to induce the company to recognize the noncomplying union. The court, agreeing with respondent's theory, took the position that such recognition would be illegal and that picketing to secure it, therefore, was subject to restraint by a state court.[2] Rehearing was denied.

Because of the significance of that decision in relation to the National Labor Relations Act, as amended, we granted certiorari and invited the Solicitor General to file a brief setting forth the views of the National Labor Relations Board. 350 U. S. 860. Such a brief was filed favoring a reversal.

There is no doubt that, if the union had filed the data and affidavits required by § 9 (f), (g) and (h), the complaint, under the circumstances of this case, would have had to be dismissed by the state court for lack of jurisdiction, and that, if an injunction were sought through the National Labor Relations Board, the request would have had to be denied on the merits. Under those circumstances, the Board would have had jurisdiction of the issue to the exclusion of the state court. *Garner* v. *Team-*

---

[2] Respondent also had sought the injunction on the alternative ground that the request for recognition of the union was being made in the absence of a selection of the union by the majority of respondent's employees. The Supreme Court of Louisiana did not pass upon this contention. The record upon which the temporary and the permanent injunctions were granted contained concededly genuine applications for union membership and authorizations of representation from 179 of the 225 eligible employees. Accordingly, we do not now consider the questions that would have been presented if the union or the pickets had represented less than a majority of the eligible employees, or if there had been a bona fide dispute as to the existence of authorization from a majority of the eligible employees.

*sters Union,* 346 U. S. 485, and see *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468. In the absence of any bona fide dispute as to the existence of the required majority of eligible employees, the employer's denial of recognition of the union would have violated § 8 (a)(5) of the Act.[3]

The issue before us thus turns upon the effect of the union's choice not to file the information and affidavits described in § 9 (f), (g) and (h). The state court misconceived that effect. The union's failure to file was not a confession of guilt of anything. It was merely a choice not to make public certain information. The Act prescribes no fine or penalty, in the ordinary sense, for failure to file the specified data and affidavits. The Act does not even direct that they be filed. The nearest to such a direction in the Act is the statement, in § 9 (g), that it shall be "the obligation" of all labor organizations to file annual reports "bringing up to date the information required to be supplied in the initial filing by subsection (f)(A) of this section, and to file with the Secretary of Labor and furnish to its members annually financial reports in the form and manner prescribed in subsection (f)(B)." However, neither subsection (f)(A) nor (f)(B) of § 9 requires any initial filing to be made. Each merely describes what is required to be filed in the event that a labor organization elects to seek the advantages offered by subsection (f).

Congress seeks to induce labor organizations to file the described data and affidavits by making various benefits of the Act strictly contingent upon such filing. See *New*

---

[3] "SEC. 8. (a) It shall be an unfair labor practice for an employer—

. . . . .

"(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9 (a)." 61 Stat. 140, 141, 29 U. S. C. § 158 (a)(5). For the material portion of § 9 (a), see note 1, *supra.*

*Jersey Carpet Mills, Inc.*, 92 N. L. R. B. 604, 610. In particular, Congress makes the services of the Labor Board available to labor organizations only upon their filing of the specified data and affidavits.[4] By its noncompliance with § 9 (f), (g) and (h), a union does not exempt itself from other applicable provisions of the Act.[5]

What, then, is the precise status of a labor organization that elects not to file some or all of the data or affidavits in question? It is significant that the effect of noncompliance is the same whether one or more of the filings are omitted. Accordingly, it simplifies the issue to assume a situation where a union has filed the non-Communist affidavits specified in § 9 (h), but has chosen not

---

[4] Congress seeks "to stop the use of the Labor Board" by noncomplying unions. *Labor Board* v. *Dant*, 344 U. S. 375, 385. For example, the following benefits are available to labor organizations only upon their voluntary compliance with the conditions prescribed in the statutory provisions listed below:

(1) The Board's investigations of questions, raised by labor organizations, concerning representation, on compliance with § 9 (f) and (h); (2) labor organizations' eligibility for certification as representatives, on compliance with § 9 (g) and (h); (3) the Board's issuance of complaints pursuant to charges by labor organizations, on compliance with § 9 (f) and (g); (4) privilege of making a union-shop agreement, see § 8 (a) (3); (5) labor organizations' right to obtain redress from Board for unfair labor practices, see § 8; (6) limited right to engage in boycott when seeking recognition, see § 8 (b) (4) (B); (7) limited right to strike for assignment of work, see § 8 (b) (4) (D); and (8) limited protection for a certified representative against a strike for recognition of a rival organization, see § 8 (b) (4) (C).

[5] The Board may provide relief in case of a refusal by a noncomplying union to bargain in good faith, as required by § 8 (b) (3). See *Chicago Typographical Union No. 16*, 86 N. L. R. B. 1041, 1048, and n. 16; *National Maritime Union*, 78 N. L. R. B. 971, 987–988. As to decertification of a noncomplying union under § 9 (c) (1) (A) (ii), see *Harris Foundry & Machine Co.*, 76 N. L. R. B. 118. For the effect of noncompliance with § 9 (h), see generally *American Communications Assn.* v. *Douds*, 339 U. S. 382, 390.

to disclose the information called for by § 9 (f)(A)(2) and (3) as to the salaries of its officers, or the manner in which they have been elected. There is no provision stating that, under those circumstances, the union may not represent an appropriate unit of employees. if a majority of those employees give it authority so to do. Likewise, there is no statement precluding their employer from voluntarily recognizing such a noncomplying union as their bargaining representative. Section 8 (a)(5)[6] declares it to be an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees, *subject to the provisions of section 9 (a)*." (Emphasis supplied.) Section 9 (a),[7] which deals expressly with employee representation, says nothing as to how the employees' representative shall be chosen. See *Lebanon Steel Foundry* v. *Labor Board*, 76 U. S. App. D. C. 100, 103, 130 F. 2d 404, 407. It does not make it a condition that the representative shall have complied

---

[6] See note 3, *supra*. When a majority of an employer's eligible employees have authorized a noncomplying union to represent them and such union later has complied with the statutory filing requirements, the union, under appropriate circumstances, has been permitted to invoke the Board's processes to remedy the consequences of the employer's prior refusal to bargain with the union.

". . . Congress has not made compliance with the filing requirements of § 9 (f), (g) and (h) a condition precedent to the obligation of an employer under § 8 (a)(5) to bargain collectively with the chosen representative of the employees; such compliance is merely made a condition precedent to invoking the machinery of the Act for the investigation of a question concerning representation, or for the issuance of a complaint charging the commission of unfair labor practices." *Labor Board* v. *Reed & Prince Mfg. Co.*, 205 F. 2d 131, 133–134. See also, *Labor Board* v. *Pecheur Lozenge Co.*, 209 F. 2d 393, 402–403; *Labor Board* v. *Tennessee Egg Co.*, 201 F. 2d 370; *West Texas Utilities Co.* v. *Labor Board*, 87 U. S. App. D. C. 179, 185, 184 F. 2d 233, 239.

[7] See note 1, *supra*.

with § 9 (f), (g) or (h), or shall be certified by the Board, or even be eligible for such certification.[8]

Likewise, § 7, which deals with the employees' rights to self-organization and representation, makes no reference to any need that the employees' chosen representative must have complied with § 9 (f), (g) or (h).[9] Section 7 provides—

> "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activ-

---

[8] A Board election is not the only method by which an employer may satisfy itself as to the union's majority status. See, e. g., *Labor Board* v. *Bradford Dyeing Assn.*, 310 U. S. 318, 338–339; *Labor Board* v. *Knickerbocker Plastic Co.*, 218 F. 2d 917, 921–922; *Labor Board* v. *Parma Water Lifter Co.*, 211 F. 2d 258, 261; *Labor Board* v. *Indianapolis Newspapers, Inc.*, 210 F. 2d 501, 503–504; *Labor Board* v. *Kobritz*, 193 F. 2d 8, 14; *Brookville Glove Co.*, 114 N. L. R. B. 213, 214, n. 4, 36 L. R. R. M. 1548, 1549, n. 4.

[9] ". . . The Act does not proscribe bargaining with a noncomplying union; indeed, consonant with public policy, an employer may voluntarily recognize and deal with such a union. If Congress had intended the Act to have the effect urged by the Respondents, it easily could have inserted an express provision in the statute to accomplish such result. This, Congress did not do." *Brookville Glove Co., supra*, at 1549. The Board there held that the employer committed an unfair labor practice (§ 8 (a)(3)) when it discharged employees who struck to induce their employer to recognize as their bargaining representative the same noncomplying union (United Mine Workers) which is a petitioner here. There also the union had been designated as their chosen representative by a majority of the eligible employees. See also, *Rubin Bros. Footwear, Inc.*, 99 N. L. R. B. 610, 619; *Labor Board* v. *Coal Creek Coal Co.*, 204 F. 2d 579, 581; *Labor Board* v. *Electronics Equipment Co.*, 194 F. 2d 650, 651, n. 1; *Labor Board* v. *Pratt, Read & Co.*, 191 F. 2d 1006, 1008. Cf. *Ohio Ferro-Alloys Corp.* v. *Labor Board*, 213 F. 2d 646; *Stewart-Warner Corp.* v. *Labor Board*, 194 F. 2d 207.

ities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8 (a)(3)." 61 Stat. 140, 29 U. S. C. § 157.[10]

Subsections (f), (g) and (h) of § 9 merely describe advantages that may be gained by compliance with their conditions. The very specificity of the advantages to be gained and the express provision for the loss of these advantages imply that no consequences other than those so listed shall result from noncompliance.[11]

The noncompliance of the union with § 9 (f), (g) and (h) in the instant case precludes any right of the union to seek certification of its status by the Labor Board.[12]

---

[10] The cross reference to § 8 (a)(3) has to do only with an exception in favor of union shops.

[11] For example, § 9 (f) prescribes that, *unless the labor organization files the required material,* "No investigation shall be made *by the Board of any question* affecting commerce concerning the representation of employees, *raised by a labor organization under subsection (c)* of this section . . . ." (Emphasis supplied.) Subsection (c) of § 9 so referred to relates to elections of collective-bargaining representatives under supervision of the Board. Section 9 (f) also prescribes that, *unless the labor organization files the required material,* "no complaint shall be issued [by the Board] pursuant to a charge made by a *labor organization under subsection (b) of section 10* . . . ." (Emphasis supplied.) Subsection (b) of § 10 so referred to relates to complaints by the Board, so that here again that which is cut off by noncompliance is only that which the Act has added. Subsections (g) and (h) of § 9 contain like provisions.

[12] For the Board's conclusion that an employer may not have recourse to the Board to verify, by certification, the union's status or lack of status as the exclusive representative of the eligible em-

Such elimination of the Board does not, however, eliminate the applicability of the National Labor Relations Act, as amended, and does not settle the issue as to the right of the state court to enjoin the employees and their union from peacefully picketing the employer's plant for the purpose of securing recognition.

The industrial relations between the company and its employees nonetheless affect interstate commerce and come within the field occupied by the National Labor Relations Act, as amended. The Labor Board is but an agency through which Congress has authorized certain industrial relations to be supervised and enforced. The Act goes further. The instant employer, employees and union are controlled by its applicable provisions and all courts, state as well as federal, are bound by them.

Section 7 recognizes the right of the instant employees "to bargain collectively through representatives of their own choosing" and leaves open the manner of choosing such representatives when certification does not apply. The employees have exercised that right through the action of substantially more than a majority of them authorizing the instant union to represent them.

Section 9 (a) provides that representatives "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment: . . . ." That fits this situation precisely. It does not require the designated labor organization to disclose

ployees, see *Herman Loewenstein, Inc.*, 75 N. L. R. B. 377; *Sigmund Cohn Mfg. Co.*, 75 N. L. R. B. 177, 180, n. 2; *National Maritime Union* v. *Herzog*, 78 F. Supp. 146, 156, aff'd, 334 U. S. 854; *Fay* v. *Douds*, 172 F. 2d 720, 724–726.

the salaries of its officers, or even to file non-Communist affidavits.

Under those sections and by virtue of the conceded majority designation of the union, the employer is obligated to recognize the designated union. Upon the employer's refusal to do so, the union, because of its non-compliance with § 9 (f), (g) and (h), cannot resort to the Labor Board. It can, however, take other lawful action such as that engaged in here.

The company can, if it so wishes, lawfully recognize the union as the employees' representative. That being so, there is no reason why the employees, and their union under their authorization, may not, under § 13, strike,[13] and, under § 7, peacefully picket the premises of their employer to induce it thus to recognize their chosen representative. See *West Texas Utilities Co.* v. *Labor Board,* 87 U. S. App. D. C. 179, 185, 184 F. 2d 233, 239, and the other cases cited in note 6, *supra.*[14]

Such being the case, the state court is governed by the federal law which has been applied to industrial relations, like these, affecting interstate commerce and the state court erred in enjoining the peaceful picketing here practiced. A "State may not prohibit the exercise of rights which the federal Acts protect." *Weber* v. *Anheuser-Busch, Inc.,* 348 U. S. 468, 474, and see *Garner* v. *Teamsters Union,* 346 U. S. 485, 494.

---

[13] "SEC. 13. Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right." 61 Stat. 151, 29 U. S. C. § 163. See also, *Labor Board* v. *Rice Milling Co.,* 341 U. S. 665, 673, and cases cited in note 6, *supra.*

[14] "Present law in no way limits the primary strike for recognition except in the face of another union's certification." Report of the Joint Committee on Labor-Management Relations, No. 986, Pt. 3, 80th Cong., 2d Sess. 71; S. Rep. No. 105, 80th Cong., 1st Sess. 22; H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. 43.

The judgment of the Supreme Court of Louisiana, accordingly, is reversed and the case is remanded to it for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE HARLAN took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting.

Although my doubts are not shared by others, they have not been overcome, and the nature of the problem raised by this case makes it not inappropriate to express them.

The problem is the recurring difficulty of determining when a federal enactment bars the exercise of what otherwise would clearly be within the scope of a State's lawmaking power. There is, of course, no difficulty when Congress explicitly displaces state power. The perplexity arises in a situation like the present, where such displacement by the controlling federal power is attributed to implications or radiations of a federal statute.

The various aspects in which this problem comes before the Court are seldom easy of solution. Decisions ultimately depend on judgment in balancing overriding considerations making for the requirement of an exclusive nation-wide regime in a particular field of legal control and respect for the allowable area within which the forty-eight States may enforce their diverse notions of policy. The Court has heretofore adverted to the uncertainties in the accommodation of these interests of the Nation and the States in regard to industrial relations affecting interstate commerce—uncertainties inevitable in the present state of federal legislation.

Proper accommodation is dependent on an empiric process, on case-to-case determinations. Abstract propositions and unquestioned generalities do not furnish answers.

In this case, the Court concludes that Louisiana law must yield to the dominance of the National Labor Relations Act. Presumably, what Louisiana has decreed in the judgment now reversed would be within Louisiana's power were it not for the argumentatively derived withdrawal of that power by the National Labor Relations Act, as amended. Over the years, the Court has found such withdrawal of state power from reasonable implications of what Congress wrote in the National Labor Relations Act in some cases and not in others. Withdrawal has been found to exist in at least two types of situations: (1) where state law interferes with federal rights conferred on employees by § 7 of the National Labor Relations Act, e. g., Hill v. Florida, 325 U. S. 538; (2) where state law makes inroads on the primary jurisdiction with which Congress has invested the National Labor Relations Board, e. g., Weber v. Anheuser-Busch, Inc., 348 U. S. 468. Here we are not concerned with the Board's primary jurisdiction. The issue is whether Louisiana, by enjoining, according to its law, a strike calculated to coerce respondent to bargain with a union which has not complied with the non-Communist and other reporting provisions, § 9 (f), (g) and (h) of the Taft-Hartley Act, interferes with the protection afforded by § 7 of that Act, where that union may represent a majority of employees.

Section 7 grants employees the federal right to engage in concerted activities in furtherance of collective bargaining. A strike accompanied by peaceful picketing is a typical expression of such authorized concerted activity. Instances of special situations that are clearly outside of this protection are (1) where the aspect that the strike action takes constitutes a union unfair labor practice interdicted by the Taft-Hartley Act, or (2) where the strike is in violation of the federal criminal law. See Southern S. S. Co. v. Labor Board, 316 U. S. 31. It

would be self-contradictory for federal law to protect conduct which federal law brands as illegal. That is not this situation. A non-complying union, such as the petitioner, however vigorously it may assert non-compliance as a matter of principle, is not under condemnation of illegality by the Taft-Hartley Act, or any other federal law, if it employs economic pressure to achieve its goal. The explicit consequence which that Act attaches to non-compliance is that such a union is denied the advantages of the National Labor Relations Board—it cannot utilize that Board's machinery to obtain certification as the bargaining representative or to secure redress against unfair labor practices by an employer.

The policy of § 9 is that of Congress and the wisdom of the policy is not our concern. But just as all fair implications must be given to § 7, so it is equally incumbent to give to the scope of the non-Communist affidavit and other reporting requirements of § 9 the reasonable direction of their meaning and purpose. So far as its own law-enforcement machinery for protecting the interests of employees is concerned, Congress designed to hamper non-conforming unions and to discriminate against them by denying them rights deemed of the utmost importance to trade unions. This being so, I find it rather difficult to conclude that, while visiting such consequences upon a non-conforming union in the federal domain of law enforcement, the Congress has impliedly withdrawn from the States the power to regulate such a union. In balancing these considerations, the weight of my judgment tips in favor of not finding in § 7 of the Taft-Hartley Act an implied limitation upon power exercised by Louisiana in the circumstances of this case.