249 F.2d 332
 LOCAL 618, AUTOMOTIVE, PETROLEUM and ALLIED INDUSTRIES
EMPLOYEES UNION, AFL-CIO, Affiliated With the International
Brotherhood of Teamsters, Chauffeurs, Warehousemen and
Helpers of America, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 15723.
 United States Court of Appeals Eighth Circuit.
 Nov. 18, 1957.
 
 Harry H. Craig, St. Louis, Mo. (Norman W. Armbruster, John T. Wiley, Jr., and Wiley, Craig, Armbruster, Schmidt & Wilburn, St. Louis, Mo., on the brief), for petitioner.
 Frederick U. Reel, Attorney, National Labor Relations Board, Washington, D.C. (Jerome D. Fenton, General Counsel, Stephen Leonard, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Melvin Pollack, Attorney, National Labor Relations Board, Washington, D.C., on the brief), for respondent.
 Before GARDNER, Chief Judge, and VOGEL and VAN OOSTERHOUT, Circuit judges.
 VAN OOSTERHOUT, Circuit Judge.
 
 
 1
 This case is before the court upon the petition of Local 618, Automotive, Petroleum and Allied Industries Employees Union, hereinafter called Union, to review and set aside an order of the National Labor Relations Board issued against the Union on December 20, 1956, pursuant to section 10(c) of the National Labor Relations Act, as amended (29 U.S.C.A. 151 et seq.), hereinafter called the Act. The Board in its answer requests the enforcement of its order. The alleged unfair labor practice occurred in St. Louis, Missouri. This court has jurisdiction under Section 10(e) and (f) of the Act.[1]
 
 
 2
 The Board, in a three-one decision, found the Union had violated section 8(b) (4)(A) of the Act, by inducing and encouraging the employees of the Drury Construction Company, hereinafter called Drury, to engage in concerted refusal to perform services for their employer, with the object of forcing Drury to cease doing business with the Site Oil Company, the employer against whom the Union was striking. The issue for our consideration is whether there is substantial evidence to support this determination.
 
 
 3
 The facts, all of which are stipulated, may be summarized as follows: Site Oil Company operated 14 retail gas stations in the St. Louis area. The station attendants were lawfully represented by the Union. Site and the Union were unable to agree upon a new employment contract. The Union called a strike on March 2, 1953, and such strike has been in effect ever since. Site hired replacements and continued operating the stations. All stations were picketed constantly during the first year of the strike. In 1954 the Union began picketing the stations intermittently, that is, roving pickets would move from station to station so that all stations were picketed from time to time. The present controversy arises solely out of picketing activities on and after August 8, 1955, at the Manchester station, one of the 14 stations heretofore referred to. The Manchester station is located some two and one-quarter miles distant from any other Site station. About March 14, 1955, Site started to rebuild its Manchester station. Drury, an independent union contractor, was engaged to do the work. The contractor, in March 1955, tore down the existing building, and erected a temporary building for station use while the new building was being constructed. On March 28, 1955, when the Union picketed the Manchester station, the Drury employees quit work and refused to cross the picket line. Site operated the Manchester station continuously until July 20, 1955. On that date it took down its signs and discontinued the operation of the station, and none of its employees has since worked there. The stipulation provides in part:
 
 
 4
 'The Company intends to resume operation of the filling station on Manchester Road after the new station building is built but has no intention of reopening said station or putting any of its employees to work there until such time.'
 
 
 5
 No picketing took place at the Manchester station between July 21, 1955, and August 8, 1955. It was stipulated that Union witnesses if called would testify that picketing at the Manchester station ceased on July 20, 1955, because the Union then believed that Site had permanently abandoned the Manchester location, and that picketing was resumed on August 8, 1955, because the Union discovered that it was mistaken in its belief that the station had been abandoned. This last stipulation provided that the General Counsel did not admit the correctness or admissibility of the stipulated testimony, and that such testimony was subject to objection as to its competency, materiality, and relevancy, and to the further objection that such testimony called for a conclusion.
 
 
 6
 Drury resumed construction work at the Manchester station on August 8, 1955. When Drury's employees arrived, there were no pickets. Union pickets appeared during the day, carrying signs reading 'Site, Flash, Mars Employees on strike.' Thereupon, Drury's employees ceased work and walked off the job. When the Drury employees returned the next day and found the Union pickets at the station, they refused to cross the picket line, and have not worked since. Truck drivers of suppliers of materials for the construction project also refused to cross the picket line to deliver the materials. The Union activity at the Manchester station was limited to peaceful picketing.
 
 
 7
 It appears beyond dispute that the Union is a labor organization within the meaning of the Act, and that it was recognized by Site as the representative of Site's employees for bargaining purposes. When negotiations for a new contract with Site failed, the Union in March 1953 struck in support of its demands, and Site employees picketed the various stations. The validity of the strike is in no way challenged except so far as it pertains to the Manchester station for the period beginning August 8, 1955. The trial examiner found that the strike was lawful throughout, that the Manchester station remained a part of the situs of the primary dispute, that the Union was free to peacefully picket there, and that the temporary cessation of picketing for a little less than three weeks just prior to August 8, 1955, was due to a mistaken belief that the Manchester location had been permanently abandoned by Site. The Board's opinion in no way attacks the validity of the Union strike and the picketing of Site's stations, except for the picketing of the Manchester station for the period commencing August 8, 1955.
 
 
 8
 We are satisfied that the evidence establishes that the strike against Site was in all respects legal and the picketing was likewise legal in all respects, excepting, for the moment, the Manchester situation which we discuss hereinafter.
 
 The Board states:
 
 9
 'To prove a violation of Section 8(b)(4)(A) of the Act, the General Counsel need only prove that an object of the picketing activity was to compel the neutral Drury Company to cease doing business with the struck employer, Site. Contrary to the Trial Examiner, we find that this minimum requirement has been fully established by the facts.'
 
 
 10
 The 'an object' test, applied here by the Board, is recognized as a proper test in cases where the picketing involved was not lawful primary picketing. National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284; International Brotherhood of Electrical Workers, Local 501 v. National Labor Relations Board, 341 U.S. 694, 700, 71 S.Ct. 954, 95 L.Ed. 1299. The Court holds that it is not necessary to find that the sole object of the strike was that of inducing a neutral employer to cease doing business with another person. However, in the cases just cited there was no lawful primary strike involved against the owner of the struck premises.
 
 
 11
 In National Labor Relations Board v. International Rice Milling Co., Inc., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277, the Court found picketing at the primary employer's premises did not exceed conduct, traditional and permissible in a primary strike, and hence that the picketing there involved did not constitute an unfair labor practice violative of section 8(b)(4)(A). The Court states (341 U.S. at page 672, 71 S.Ct. at page 965):
 
 
 12
 'That Congress did not seek, by 8(b)(4), to interfere with the ordinary strike has been indicated recently by this Court. * * *'
 
 
 13
 In footnote 6 in support of this statement, it is said (341 U.S. at page 672, 71 S.Ct. at page 965):
 
 
 14
 'In this Act 'Congress safeguarded the exercise by employees of 'concerted activities' and expressly recognized the right to strike.' International Union, etc. v. O'Brien, 339 U.S. 454, 457, 70 S.Ct. 781, 782, 94 L.Ed. 978; see also, Amalgamated Ass'n of, etc., Employees v. Wisconsin Employment Relations Board, 340 U.S. 383, 389, 404, 71 S.Ct. 359, 362, 370 (95 L.Ed. 364); United Electrical & Machine Workers, 85 N.L.R.B. 417, 418; Oil Workers International Union, 84 N.L.R.B. 315, 318-320.'
 
 
 15
 See also footnotes 7 and 8.
 
 
 16
 Section 7 of the Act protects the right to bargain collectively and to engage in concerted activities for such purpose. Section 13 protects the right to strike.
 
 
 17
 In Oil Workers International Union, 84 N.L.R.B. 315, Pure Oil used Standard's docks for loading. Pure Oil's loading was interfered with because of a lawful strike at Standard and the resulting picketing of the loading dock. The Board discusses the legislative history of section 8(b)(4)(A) and finds the picketing was primary and that no secondary boycott violation was involved. The Board states (p. 318):
 
 
 18
 '* * * Senator Taft also stated that primary strikes over terms and conditions of employment were 'entirely proper' and 'throughout this bill are recognized as completely proper strikes.'
 
 
 19
 'In the absence of any affirmative legislative history indicating that Section 8(b)(4)(A) was intended to curb traditional primary action by labor organizations, and because the only available legislative history indicates the contrary, we conclude that the section does not outlaw any of the primary means which unions traditionally use to press their demands on employers. * * *'
 
 
 20
 In United Electrical, Radio and Machine Workers of America, 85 N.L.R.B. 417, Bucyrus' employees were engaged in a lawful strike. Ryan was doing contruction work upon the struck employer's premises. Picketing was in progress. A separate gate was cut for the use of Ryan employees only. This gate was then picketed. Such picketing was held to be proper primary picketing, the Board stating (p. 418):
 
 
 21
 '* * * Section 8(b)(4)(A) was not intended by Congress, as the legislative history makes abundantly clear, to curb primary picketing. It was intended only to outlaw certain secondary boycotts, whereby unions sought to enlarge the economic battleground beyond the premises of the primary Employer. When picketing is wholly at the premises of the employer with whom the union is engaged in a labor dispute, it cannot be called 'secondary' even though, as is virtually always the case, on object of the picketing is to dissuade all persons from entering such premises for business reasons. * * * It follows in this case that the picketing of Bucyrus premises, which was primary because in support of a labor dispute with Bucyrus, did not lose its character and become 'secondary' at the so-called Ryan gate because Ryan employees were the only persons regularly entering Bucyrus premises at that gate. * * *'
 
 
 22
 The foregoing language is quoted with approval in the Moore Dry Dock Company case, 92 N.L.R.B. 547, 548.
 
 
 23
 In General Teamsters, Chauffeurs etc., 112 N.L.R.B. 311, the Board held that picketing at the site of a construction project upon employer's premises, which was somewhat isolated from the portion open for business, was permissible, so long as the pickets made it clear that their dispute was with their employer.
 
 
 24
 The Moore Dry Dock Company case, supra, announces the Board's common situs doctrine, holding that picketing of premises of a secondary employer is primary if the picketing meets the following conditions: '(a) The picketing is strictly limited to times when the situs of dispute is located on the secondary employer's premises; (b) at the time of the picketing the primary employer is engaged in its normal business at the situs; (c) the picketing is limited to places reasonably close to the location of the situs; and (d) the picketing discloses clearly that the dispute is with the primary employer.' The Moore Dry Dock Company case has been approved by a number of the circuits. N.L.R.B. v. Service Trade Chauffeurs, etc., 2 Cir., 191 F.2d 65, 68; Piezonki v. N.L.R.B., 4 Cir., 219 F.2d 879, 883; N.L.R.B. v. Chauffeurs, Teamsters, etc., 7 Cir., 212 F.2d 216, 219; N.L.R.B. v. Local Union No. 55, 10 Cir., 218 F.2d 226, 231.
 
 
 25
 The common situs cases have some bearing upon the balancing of the primary right to strike against the prohibition of secondary boycotts, but do not bear as directly upon our present problem as the primary situs cases heretofore discussed.
 
 
 26
 We emphasize that in our present case the strike was at the business situs of the struck employer. The legality of the strike and picketing at all stations prior to August 8, 1955, is conceded, and the legality of the strike and picketing at the stations other than Manchester subsequent to August 8, 1955, is not questioned. It is difficult for us to find evidentiary support for the Board's determination that the picketing, which was part of a legal primary strike against Site at its place of business before August 8, became an unfair labor practice at the Manchester station after August 8. The March picketing at the Manchester station had the same effect upon Drury's employees as the picketing now complained of, but no unfair labor practice is asserted as to such picketing.
 
 
 27
 We do not believe the temporary cessation of picketing between July 21 and August 8 changed the character of the picketing when it was resumed. The only reasonable explanation of the interruption, under the record, is that set forth by the trial examiner, which is to the effect that the Union stopped picketing when it believed the station was being permanently abandoned, and that picketing was resumed when the Union learned it was mistaken. In the meantime the strike had continued, and lawful picketing had been maintained at Site's other stations.
 
 
 28
 We do not disagree with the Board's finding that the picketing induced Drury's employees to quit. The Board stated:
 
 
 29
 'As to the facts that the picketing induced the work stoppage there can be little doubt. It is true that the picket signs made no reference to the Drury Company or its employees. Nevertheless, implicit in every picket line is a fixed command to all union sympathizers not to cross the imaginary 'line'; every picket normally invites a work stop-page on the spot.'
 
 
 30
 Section 8(b)(4)(A) requires that the union induce concerted action on the part of the neutral employees. The only evidence here is that the Union maintained a peaceful picket line at a place of the primary employer. The signs carried by the pickets clearly indicated that their dispute was with Site, their employer. In N.L.R.B. v. International Rice Milling Co., supra, the Court states (341 U.S. at page 671, 71 S.Ct. at page 964):
 
 
 31
 '* * * A union's inducements or encouragements reaching individual employees of neutral employers only as they happen to approach the picketed place of business generally are not aimed at concerted, as distinguished from individual, conduct by such employees. Generally, therefore, such actions do not come within the proscription of 8(b)(4), and they do not here.'
 
 
 32
 We do not believe that the picketing here differed materially from that prevailing in the Rice Milling Company case. However, for the purposes of this case, we shall assume, without so deciding, that the picketing induced concerted action on the part of the neutral employees.
 
 
 33
 The Board took the position that, in order to establish the unfair labor practice urged, it was necessary for the General Counsel to prove only that an object of the picketing was to compel Drury to cease doing business with the struck employer. Upon the basis of the authorities heretofore cited, considering the fact that the strike was a continuing one at the situs of the primary employer, we do not believe that the Board adopted the proper standard. We believe that under the circumstances existing here it would be necessary to establish that the picketing had no legitimate purpose in connection with the primary strike. Evidentiary support for such a conclusion is lacking. The Board overlooks the fact that peaceful picketing had been in progress for several years before the construction project involving Drury came into existence. It is apparent that the picketing since Drury started work has been the same as it was prior thereto. Obviously, the primary purpose of the picketing continued to be the obtaining of collective bargaining rights from the primary employer.
 
 
 34
 The Board asserts that the strike has not been successful as Site has succeeded in hiring others to run the stations and the pickets did not frighten them. The scope of a strike is much broader than discouraging replacement employees. Among other things, a strike may properly publicize the union's difficulty with the employer. In Milk Wagon Drivers Union of Chicago, etc. v. Meadowmoor Dairies, Inc., 312 U.S. 287, 293, 61 S.Ct. 552, 555, 85 L.Ed. 836, the Court states, 'Peaceful picketing is the workingman's means of communication.' In United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, at page 75, 76 S.Ct. 559, at page 567, 100 L.Ed. 941, the Court states:
 
 
 35
 '* * * there is no reason why the employees, and their union under their authorization, may not, under 13, strike, and, under 7, peacefully picket the premises of their employer to induce it thus to recognize their chosen representative. * * *'
 
 
 36
 We believe that the duration of the picketing in support of a lawful strike is a matter the union is entitled to decide. There is no legal time limit on strikes. We find no substantial support in the record for the Board's conclusion that the picketing was not a lawful incident in the continuing strike against the employer.
 
 
 37
 A further reason in support of the validity of the picket line is the fact that the Manchester station, which was temporarily closed, could be reopened at any time. The station was equipped to operate while the construction was in progress. It is true that the stipulation provides that Site did not intend to reopen the station until the building was completed. However, there is nothing in the record to indicate that the Union had knowledge of such intention. In any event, Site was not bound by such intention and was free to reopen the station whenever it chose to do so.
 
 
 38
 In N.L.R.B. v. General Drivers, Warehousemen and Helpers, etc., 5 Cir., 225 F.2d 205, a case involving common situs, enforcement of the Board's order was denied. The court discusses in some detail the consideration to be given inferences drawn by the Board, and concludes (at page 211):
 
 
 39
 'While the drawing of appropriate inferences as to the unlawfulness of objective and motive in a labor dispute is primarily the province of the Board, there still must be some substantial basis for inferring a wrongful rather than a legitimate motive, which we think does not exist here.'
 
 
 40
 Board Member Murdock, in his dissent in the present case, states:
 
 
 41
 'The majority is today holding for the first time, that the right to picket a primary employer's premises in a current labor dispute may be extinguished at the whim of the primary employer if he chooses to shut down temporarily and to remove his employees from the premises, leaving only the employees of a neutral contractor called in for reconstruction work. The radical departure from earlier Board law, and the threat to the rights of striking employees entailed in this decision cannot be overemphasized.'
 
 
 42
 We can find no direct case support for the conclusion here reached by the Board. We believe that this case marks a radical departure from the law as previously announced by the Board in the primary situs cases heretofore discussed. We can find no authority which would permit an employer involved in a lawful strike to avoid the effects of the strike by announcing a temporary shutdown for repairs or improvements.
 
 
 43
 We believe that under the circumstances here existing, where lawful picketing in support of a valid primary strike is in progress against the primary employer at the employer's premises, the 'an object' test applied by the Board is too narrow, and that there should be evidentiary support for a conclusion that the primary picketing serves no lawful purpose. We conclude that the Board's decision was induced by a misapprehension of the law applicable to the factual situation confronting it, and that there is no evidentiary support for a conclusion that the Union was guilty of the unfair labor practice charged.
 
 
 44
 The order of the Board is set aside, and the Board's petition for enforcement is denied.
 
 
 
 [1]
 The Board's determination that the involved activities affect commerce is not disputed. The Board's decision and order are reported at 116 N.L.R.B. 1844