**John P. KRYSTYNIAK d/b/a Red & White Super Markets, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 17563.**

United States Court of Appeals
Third Circuit.

Argued June 19, 1969.

Decided July 31, 1969.

As Amended on Denial of Rehearing
Sept. 12, 1969.

Thomas P. Schnitzler, Jackson, Lewis, Schnitzler & Krupman, New York City (Robert Lewis, Allen B. Breslow, New York City, on the brief), for petitioner.

Seth Rosen, National Labor Relations Board, Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, H. M. Levy, Atty., National Labor Relations Board, on the brief), for respondent.

Before HASTIE, Chief Judge, and McLAUGHLIN and SEITZ, Circuit Judges.

OPINION OF THE COURT

GERALD McLAUGHLIN, Circuit Judge.

The National Labor Relations Board found that the employer-petitioner had violated Sections 8(a) (1) of the National Labor Relations Act by coercive employee interrogations regarding union activities and employee reaction to and in connection therewith; by promises of benefits made by petitioner and his store managers; threats of reprisals against employees for engaging in union activity and by discharge in event the union won the election; granting or promising of wage raises during the organizing campaign; threats to lay off part time employees if the union won; threat by petitioner about closing his Mt. Pleasant store (petitioner operated three grocery stores in the Commonwealth of Pennsylvania) and not staying in business if union got in the store;

---

petitioner at his Greensburg store employees meeting saying that he would "* * * like to know who those people are that did that to me" which the Board held "implied that employees whose participation in union activities became known might be made to suffer harmful consequences as a result thereof" (in violation of Section 8(a) (1)). The Board also directly held that the above found course of conduct by petitioner "evinces a rejection of the collective bargaining principle." The Board, therefore, concluded that petitioner's refusal to recognize and bargain with the union was not motivated by good faith doubt of the union's majority, and was violative of Section 8(a) (5) and (1) of the Act. Petitioner, asserting that the Board's order is not supported by substantial evidence, asks that it be set aside and enforcement thereof denied. The Board has a cross-application for enforcement of its order.

Petitioner's first point is that he was denied due process of law. This is based upon the allegation in the Board's complaint that petitioner by his attorneys had "suggested to employees that they withdraw their union authorization cards."

The record shows that petitioner's charge of denial of due process is groundless. The Board, on the basis of testimony it credited, did hold that petitioner through his lawyers had not violated the Act by their questioning of employees. Nevertheless there was some evidence of the attorneys suggesting that employees withdraw their authorization cards. There was also inferential proof, pointing to that practice by petitioner directly and on his behalf. There was nothing in the complaint or Board action which in any way prevented petitioner's attorneys from legitimately representing petitioner in his defense to the Board's complaint.

Petitioner admits that he refused to bargain with the union. He asserts that he was entitled to refuse to bargain on the theory that he "had a good faith

doubt of the union's majority status." He states categorically in his brief that his doubt was based upon the following factors: He immediately expressed his doubt to the union and filed a representation petition. He says his response to the union's demand for recognition was a denial of the union's majority status. When the union organizer demanded of him that he recognize the union he alleges that "he told him (the organizer) that I didn't think he represented a majority of my people." He makes the blanket declaration that "He had knowledge of threats, bribes and intimidation of his employees by the union in its attempt to obtain signed authorization cards." He claims previous attempts to organize his employees had failed. He said that he believed that the union did not represent a majority of all his employees as the union had warranted to him. He further states that he was not aware that a majority of his employees had signed authorization cards. He specifically says he was informed that his employees did not want a union. He concludes his reasons for what he calls "good faith doubt of the union's majority status" by the pronouncement that "He knew that authorization cards are an unreliable indication of union support."

Petitioner's above noted last statement of why he contends he "had a good faith doubt of the union's majority status" is very clear and was never changed in the slightest degree. Forty-nine employees signed authorization cards to the union as bargaining representative of the employees of petitioner's three stores. The employee bargaining unit as found by the Board consisted of eighty-three employees. Those who had signed the cards constituted a heavy majority of all the employees. At least twelve employees testified at the hearing in support of the complaint. Other employees attended the hearing. None of the authorizations was repudiated. The petitioner's evidence consisted of his own, his assistant, his managers, an assistant manager and three of his lawyers. Not

a single union eligible was a witness supporting the petitioner's views.

Petitioner's theory as expressed in his brief is that even assuming "arguendo that the union possessed authorization cards from a majority of the employer's employees at the time of the demand and assuming further that this demand was clear and unequivocal, an employer cannot be found guilty of refusing to recognize the union if the employer has a good faith doubt about the union's majority status." With this in mind let us examine petitioner's other reasons for his alleged "good faith doubt". The union organizer presented petitioner with copies of forty-nine authorization cards [1] and advised him that the union represented the majority of his employees and therefore requested recognition by him as bargaining representative of said employees. Petitioner refused to take the cards and flatly denied the union's majority status. As above mentioned he, without qualification, said this was his response to the demand for recognition. Refusing to even look at the cards in front of him (or later when they were mailed to him) he told the organizer "that I didn't think he represented the majority of my people."

Petitioner, next in his brief, sets out that "He had knowledge of threats, bribes and intimidation of his employees by the union in its attempt to obtain signed authorization cards." There is no authentication of this by any of the employees who authorized the union to be their representative nor is there employee evidence in any respect corroborating petitioner's deliberate accusation. The one mention at the hearing on that issue is petitioner's own testimony.

Asked why he told the union official he doubted the union majority he answered, "I told him because I was told or heard that my people were intimidated to sign a card and they were being coerced in doing so." He said "One of the ladies came to me and said she had been contacted and they wanted her to sign up and join a union and she said she wanted nothing to do with it. Another lady was telling me that they came to her and she closed the door and didn't even let them in the house * * *." Asked by his lawyer "You mentioned previously about having information concerning intimidation and bribery. Could you explain this more clearly?" The witness answered "Yes. * * * Mrs. Helen Buczek told me herself that she was bribed, that she was pestered four or five times [2] and another lady * * * I have the lady in the bakery that she told me that she was annoyed and threatened along the streets to sign a card and she was walking between the store and her home." His lawyer asked him "What employee, if any, told you that they were bribed to sign a card?" Witness, "I had an employee tell me that they were offered 60 cents an hour if they would sign a card." The Examiner inquired "Is it someone who has a card?" The attorney answered "I will have to ask the witness." The latter said "I could name the individual who told me, yes. It was told to me by people in the Meat Department. Jim Gyurke was talking about it and he said that the boys were told that they were —." [3] The Examiner noted the hearsay element and asked the attorney to "present the case properly." The lawyer answered "All right" and put the following question to the petitioner, "Mr. Krystyniak, did you receive any information that concerned what success these organizers were having with your people?" Answer, "Yes, I did." Q. "What type of information?" A. "That the people were being contacted and they wanted nothing to do with it." Q. "Were there any other reasons to substantiate your doubt as to the union's claims?" A. "Yes: I have had experi-

---

1. Fifty union authorization cards were offered in evidence at the Board hearing. Five of these were excluded and 45 found to be valid.

2. Mrs. Buczek did not sign an authorization card. She was not a hearing witness.

3. Gyurke did not sign an authorization card. He was not a hearing witness.

ence with unions trying to organize my people before. * * * They have had a difficult time getting even 30 per cent, which is necessary to file a petition." Asked "Did this particular union fail in the past at your place?" A. "Yes. My older employees have been with me for a long time and they have rejected it before."

The only other testimony as to petitioner's doubt of a majority was "Subsequent to the 31st (January 1967), I was told by a couple of employees that they thought that when they signed this card, that they didn't realize that they were giving away their right to vote and they really thought that this was a change to express how * * *." The Examiner struck this testimony as "not the type of evidence which either the Board or the Court has said will affect the case."

There is no further evidence from petitioner or other witness in connection with petitioner's accusation of threats, bribes and intimidation of his employees. The above referred to testimony also covers all the evidence given on petitioner's behalf respecting petitioner's remaining named reasons for what he describes as his "good faith doubt" of the union majority, i.e. that previous attempts to organize his employees had failed; that he was not aware that a majority of his employees had signed authorization cards and that he was informed that his employees did not want a union.

It is of the utmost significance that throughout petitioner's grossly tendentious eighty-three pages of testimony he does not ever really challenge his own assumption "arguendo that the union possessed authorization cards from a majority of the employer's employees at the time of the demand and assuming further that this demand was clear and unequivocal * * *." In the same category is the major fact that not one of the accredited eighty-three employees, including those who did not sign authorization cards, or indeed, any of the other assorted petitioner witnesses (assistant to petitioner, managers, assistant

manager and three of petitioner's lawyers) give any support whatsoever to those grounds advanced by petitioner for his "good faith doubt".

Petitioner's basic proposition here is *"He knew that authorization cards are an unreliable indication of union support."* He is totally wrong in that far-reaching, far-fetched edict which is typical of the defense offered. The acceptance of authorization cards and other means than a Board election to invoke a bargaining obligation has been in existence at least since 1940. N.L.R.B. v. Bradford Dyeing Ass'n, 310 U.S. 318, 339–340, 60 S.Ct. 918, 84 L.Ed. 122 (1940); Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1943); United Mine Workers v. Arkansas Oak Flooring Co., 351 U.S. 62, 76 S. Ct. 559, 100 L.Ed. 941 (1956). In the recent Supreme Court decision in N. L. R. B. v. Gissel, Packing Co., Inc., 395 U. S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (June 16, 1969) it had been decided below that authorization cards are such inherently unreliable indicators of employee desires that they may never be used to determine a union's majority and to support an order to bargain. The Court, 89 S.Ct. p. 1934, in reversing that holding ruled "That the cards, though admittedly inferior to the election process, can adequately reflect employee sentiment when that process has been impeded, needs no extended discussion, for the employer's contentions cannot withstand close examination."

The Board's proofs at the hearing revealed most substantial evidence that the bargaining process had been impeded. Union officials Novotny and Richey testified that they had advised petitioner that the union had a majority of employees authorization cards; had offered him personally and later by mail complete copies of same; that petitioner had refused to look at them or accept those mailed. It is not denied that Novotny and Richey cautioned petitioner not to threaten or coerce his employees in their right to organize. Petitioner himself said that as soon as the organiz-

er walked out he told his attorney to file a representation petition, this without examining the cards or otherwise checking the formal notification that the majority of his employees had authorized the union to act as their bargaining representative. Union organizer Lutty was successful in seeing petitioner on January 31, 1967. He asked petitioner to recognize the union as the employees representative. Petitioner's attorney who was with petitioner said the latter would not recognize the union.

At least eleven employees were called as witnesses by the Board. The first of these, Josephine Sarafine, told of a meeting of mostly all the employees of petitioner's Mt. Pleasant store with petitioner and his assistant Craig. She testified that petitioner told the employees that "if the union got in he don't know how long he would be able to go along according to the union." He didn't know "how long he could keep his doors open. It may only last six months" and then he said "Where would your job security be then? * * * that the union representatives would be making $700 a month on dues that we would have to pay and they would spend their time in a place like the Romer Room [a tavern]." Petitioner told his employees that the executives had a meeting in December "to figure out a way on how to get us raises." He said he was paying minimum wages when he only had to pay 85% of that. He was asked about employee breaks. He told his assistant "to figure a way to have us a break". He also directed the assistant to chalk up for two hours at time and a half for the employees which was the first time the employees had been paid time and a half for a meeting. This witness said that she was called into the office about January 24, 1967 and given a rise. She was told that petitioner was considering another paid holiday and picking up an additional percentage of hospital insurance. On January 31, petitioner talked with the witness and four other girls. He told them that the union organizers had said they had the majority of people

signed up and he didn't believe it and he'd had his attorney file a petition for an election. He then said to them "those of you who have signed cards know who you are and at the election you can do the same if you wish." In February 1967, Frank, one of the employer's lawyers, questioned her as to whether she had signed a card. She answered yes. He asked her what the card meant to her. She said the purpose of the card was to organize the Red and White (title of petitioner's stores) employees. "He asked me did I ever think of asking for my card back and I told him no."

Another employee, Mrs. Borgo, was at the Greensburg store meeting on January 20, 1967 when petitioner told the employees he was going to enlarge the store and planning on giving them a raise in February. He stated that "If a union would come in there would have to be some cuts." He said that the union men had visited him that morning, offered him the union cards, asked him for recognition because of having 51% of the cards, that he refused to recognize them and that he was going to fight it. On February 9, 1967, another of petitioner's attorneys, Vaccaro, had interviewed her. He asked if anybody had approached her about returning her card. She answered "No". He asked "If I had ever considered returning it?" Her answer was "No". In January 1967, the Greensburg store manager showed her he had her listed as a "generally good worker". He told the witness she would get a 15 cents raise.

A Mt. Pleasant store employee, Mary Czekaj, testified that the assistant manager, Garstecki, had told her "if the union would get into the store, John (petitioner) would fold up." In January 1967 he told her John couldn't afford to pay higher wages and therefore part timers would be laid off. During that month petitioner's assistant, Craig, asked her who was working for the union and she refused to tell him.

James Pravlick, a Mt. Pleasant store employee, testified that at the January

19th meeting, petitioner had said that if the union got into the store he doesn't see how he could stay in business very long—that union representatives were not interested in us but just the dues that could be collected and that they would be up in the Romer Room, smoking cigars.

Mary Biller, cashier at the Greensburg store, testified that petitioner on January 31, 1967 had said that two men had walked into the store today and told him they had 51% of the employees signed up and would like him to recognize the union. Petitioner said he did not want to see the authorization cards. Interviewed by an employer attorney who asked, did the union promise benefits? The witness answered "They didn't promise anything." Then queried the attorney "If anyone would approach you, would take back your union card?" The witness answered "No". Said the attorney "Would you take it back now?" "The witness again answered "No." Romayne Matthews, Greensburg store cashier, testified that an employer attorney asked her early in 1967, if she had signed a union card. She answered "Yes". Next he asked did she want to change her mind and withdraw her card and she answered "No."

The balance of the employee witnesses mostly testified about signing authorization cards themselves and having other employees sign them. Apparently all of the employee witnesses had executed affidavits, copies of which had been given to the employer's attorneys or were so given at the hearing. Two or three of those witnesses after stating they had signed authorization cards and it had been established that the employer's attorneys had copies of their affidavits, were not examined further or cross-examined.

We find that the hearing evidence in this matter strongly supports the findings of the Board above outlined. That evidence on the whole case completely justifies the Board's decision that petitioner did interfere with, restrained and coerced his employees in the exercise of their organizational rights in violation of Section 8(a) (1) of the Act, Universal Camera Corporation v. N.L.R.B., 340 U.S. 474, 491, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N.L.R.B. v. Walton Mfg. Co., 369 U.S. 404, 405, 82 S.Ct. 853, 7 L.Ed.2d 829 (1962); N. L.R.B. v. Nina Dye Works Co., 203 F.2d 849, 852 (3 Cir. 1953).

### ORDER

As to the Section 8(a) (5) finding and the bargaining order, it is the fact that between the time this case was briefed and decided by this court, the United States Supreme Court filed its opinion in N.L.R.B. v. Gissel Packing Co. et al., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). That decision vitally affects refusals to bargain and bargaining orders. In the light of this situation the Board, while it believes an 8(a) (5) finding and a bargaining order are well supported by the record before us, requests the opportunity to reconsider the 8(a) (5) portion of its decision and order herein.

The petition to review will be denied. The Board's order as to violations of Section 8(a) (1) of the Act will be enforced. The bargaining order portion of the Board's order will be remanded to the Board for its further consideration.